Carol A. ELEWSKI, Plaintiff–Appellant,

v.

CITY OF SYRACUSE; Roy Bernardi, in his official capacity as Mayor of the City of Syracuse, Defendants–Appellees.

No. 2061, Docket 96–7227.

United States Court of Appeals, Second Circuit.

Submitted Sept. 20, 1996.

Decided July 31, 1997.

Carol A. Elewski, Syracuse, NY, pro se.

Joseph E. Lamendola, Corporation Counsel (Lisa DiPoala–Haber, of counsel), Syracuse, NY, for Defendants–Appellees.

Before: WINTER, Chief Judge,
MESKILL and CABRANES, Circuit
Judges.

WINTER, Chief Judge:

Carol A. Elewski, an atheist and resident of the City of Syracuse, brought this action under 42 U.S.C. § 1983 seeking declaratory and injunctive relief against the display of a crèche by the City in a downtown public park. Having denied Elewski's application for a preliminary injunction, the district court held a consolidated hearing on the merits pursuant to Rule 65(a)(2), Fed.R.Civ.P., and entered judgment against her. We affirm.

## BACKGROUND

During the 1995 winter holiday season, as in past years, the City erected and displayed a crèche (or nativity scene) in Clinton Square, a public park in downtown Syracuse. The origins of the crèche are unclear, perhaps because of its age. Indeed, the record does not even establish when it was first displayed, the earliest possible date being 1913. However, it is clear that the City owns it. As displayed in Clinton Square in 1995, the crèche faced Salina Street, a major downtown thoroughfare, and rested on an approximately ten-foot by eight-foot wooden platform raised about two feet above sidewalk level. Included in the crèche were statues representing Jesus, Mary, and Joseph, a shepherd, a donkey, a lamb, and an angel suspended over the other figures and bearing a banner reading "Gloria in Excelsis Deo" ("Glory to God in the Highest"). At the City's expense, the crèche was illuminated at night by two forty-watt spotlights. It is erected and taken down each year by City employees using City equipment. During the past winter holiday season, three city employees performed these tasks at a cost of $396.00.

The crèche is located at the foot of a fifty-five foot evergreen tree decorated with colored lights and a star at the top. The crèche and the holiday evergreen tree were at the corner of Salina and Water Streets and were surrounded by sawhorse barricades with red lettering reading "SPECIAL EVENTS" and "ROY A BERNARDI, MAYOR" with "DPW" on the slats. The City pays for the transport, erection, illumination, and dismantling of the tree.

Also at its expense, the City decorates other parts of downtown Syracuse with secular symbols during the winter holiday season. Lampposts, including those on Salina and Water Streets, are adorned with greenery, wreaths, and colored lights. Another area the City decorates is Hanover Square, which is located on the other side of Water Street and in the next block approximately 200 feet from Clinton Square. The City's decorations in Hanover Square consist of twelve wire bells with artificial greenery and lights, an evergreen tree with colored lights and a star, a snowman and a reindeer, both made up of lights and wire.

Hanover Square is also the site of a menorah owned by Chabad Lubavitch, a private religious organization. The menorah, located approximately 300 feet from the crèche, is displayed during a portion of the same period of time in which the City displays holiday

decorations in the downtown area. Chabad Lubavitch applied for (and was granted) a permit to place the menorah. A sign posted on the menorah reads:

THE LIGHTS OF THE MENORAH COMMEMORATE THE MIRACLE OF CHANUKAH—THE FREEDOM OF THE HUMAN SPIRIT.

FREEDOM FROM TYRANNY AND OPPRESSION

THE VICTORY OF LIGHT OVER DARKNESS

·HAPPY CHANUKAH

CHABAD LUBAVITCH

424–0363

Chabad Lubavitch is assisted by City workers in erecting, dismantling, and lighting the menorah. It is billed by the City for partial reimbursement of the City's costs. Last season, that bill was for $267.68. However, the City bore some $460 of costs for providing fire department personnel during the lighting ceremony.

Ronald Jennings, Commissioner of Parks, Recreation, and Youth Programs, testified about the decorations and a number of events such as story-telling that the City sponsors during the winter holiday season, including the display of the menorah. Asserting the City's openness to different religions, he further testified that "[i]f a request is made and is reasonable, we try to accommodate it." As to the timing and purpose of the City's activities, the commissioner stated that the City's celebration began earlier than usual, on November 24, 1995 (the day after Thanksgiving) rather than the first Friday in December, in response to requests from merchants that the downtown holiday season begin at the same time as at the suburban shopping malls. He testified that the purpose of the holiday decorations was to bring the community together to celebrate the holiday season and to promote business in the downtown area. He also testified that the various holiday decorations are determined by the City and not by any religious organization.

The only other witness who testified at the hearing was Roy A. Bernardi, Mayor of the City. The Mayor agreed with Commissioner Jennings that in addition to bringing the community together for the holidays, the purpose of the various decorations was to promote downtown business. The Mayor also stated that the business community had lobbied for the early beginning to the holiday ceremonies.

Finding that the crèche was not a religious endorsement in light of its overall setting and that the various decorations had a secular purpose, the district court found no Establishment Clause violation. *Elewski v. City of Syracuse*, 95–CV–1830 (FJS), 1996 WL 31169 (N.D.N.Y. Jan.19, 1996).

DISCUSSION

Neither Elewski nor the City disputes that the district court's findings of adjudicative fact are subject to reversal only if clearly erroneous, Fed.R.Civ.P. 52, and that *de novo* review is appropriate for conclusions of law or mixed fact and law. *United States v. Moore*, 968 F.2d 216, 221 (2d Cir.1992).

█ Establishment Clause caselaw applies a highly fact-specific test to government-sponsored crèches: Would a reasonable observer of the display in its particular context perceive a message of governmental endorsement or sponsorship of religion? *County of Allegheny v. Greater Pittsburgh ACLU*, 492 U.S. 573, 593–94, 599–600, 109 S.Ct. 3086, 3100–01, 106 L.Ed.2d 472 (1989); *Lynch v. Donnelly*, 465 U.S. 668, 690, 693–94, 104 S.Ct. 1355, 1368, 1369–70, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring); *see also Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995); *Creatore v. Town of Trumbull*, 68 F.3d 59, 61 (2d Cir.1995); *Chabad–Lubavitch of Vermont v. City of Burlington*, 936 F.2d 109, 111 (2d Cir.1991) (per curiam), *cert. denied*, 505 U.S. 1218, 112 S.Ct. 3026, 120 L.Ed.2d 897 (1992), *Kaplan v. City of Burlington*, 891 F.2d 1024, 1030 (2d Cir. 1989), *cert. denied*, 496 U.S. 926, 110 S.Ct. 2619, 110 L.Ed.2d 640 (1990). The question of whether a reasonable viewer would per-

ceive a message of endorsement of religion from a government-sponsored crèche is "in large part a legal question to be answered on the basis of judicial interpretation of social facts." *Lynch v. Donnelly*, 465 U.S. 668, 694, 104 S.Ct. 1355, 1369, 79 L.Ed.2d 604 (1984) (opinion of O'Connor, J.).

■ We have noted that the outcome-determinative opinions of Justices O'Connor and Souter in *Capitol Square* should guide us, and that " 'the endorsement test necessarily focuses upon the perception of a reasonable, informed observer [who] must be deemed aware of the history and context of the community and forum in which the religious display appears.' " *Creatore*, 68 F.3d at 61 (quoting *Capitol Square*, 515 U.S. at 773–74, 779–80, 115 S.Ct. at 2452, 2455 (O'Connor, J., concurring in part and concurring in the judgment)).

After *Allegheny* and *Lynch*, therefore, not every city-owned-and/or-displayed crèche violates the Establishment Clause. *Lynch* squarely upheld a city's erection of a crèche that it owned as part of its Christmas display in a park owned by a nonprofit organization. *Lynch*, 465 U.S. at 671, 104 S.Ct. at 1358. A key factor leading to that conclusion, especially in light of the later *Allegheny* decision, was that the crèche was only a small part of an otherwise secular display. *Allegheny*, 492 U.S. at 598, 109 S.Ct. at 3103; *Lynch*, 465 U.S. at 671, 688, 104 S.Ct. at 1358, 1366.

In *Allegheny*, however, the Court struck down a stand-alone crèche on the central staircase of a courthouse. 492 U.S. at 598–602, 109 S.Ct. at 3103–3105. The crèche had been erected by a religious organization with a plaque indicating its sponsor. By contrast, in the same case, the Supreme Court upheld the display of a privately owned menorah. The menorah was stored, erected, and removed at City expense each year. *Id.* at 587, 109 S.Ct. at 3097 (opinion of Blackmun, J.). It was displayed next to the City–County Building and City's Christmas tree at the foot of which was a sign bearing the mayor's name.[1] *Id.* at 581–82, 613–21, 109 S.Ct. at 3094, 3111–15 (opinion of Blackmun, J.); *id.*

at 632–37, 109 S.Ct. at 3121–24 (opinion of O'Connor, J.); *id.* at 655, 109 S.Ct. at 3133 (opinion of Kennedy, J. joined by Rehnquist, C.J., White, J., and Scalia, J.).

Although *Allegheny* dealt in large part with governmental favoring of private religious speech through a private crèche and *Lynch* concerned public expression through a publicly sponsored crèche, in either situation the test is whether a message of endorsement would be perceived by a reasonable observer. *Capitol Square*, 515 U.S. at 762–66, 115 S.Ct. at 2447–48. Thus, if a crèche's context—like the context of the crèche in *Lynch* or that of the menorah in *Allegheny*—neutralizes the message of governmental endorsement, then the crèche passes muster under the Establishment Clause.

■ Elewski argues that the crèche here is an isolated display and that the menorah and secular symbols in Hanover Square are not part of the relevant context. We disagree. A reasonable observer is not one who wears blinders and is frozen in a position focusing solely on the crèche. To get to either Clinton or Hanover Square, one has to use streets with lampposts decorated with artificial greenery, wreaths, and colored lights. The squares themselves are across the street from each other. A reasonable observer traveling on Salina Street would thus observe decorated lampposts, lights, decorated trees, reindeer, a snowman, and wire bells. As the traveler approached the intersection of Salina and Water Streets, the crèche would be visible on the right and the menorah would become visible on the left. A photograph in the record indicates that a traveler on Water Street approaching the intersection would have both the crèche/holiday tree exhibition and the menorah in view. The menorah is thus on the same street as the crèche/holiday tree but in the next block.

A reasonable observer would also know that downtown Syracuse merchants encourage the holiday display, including its earlier than usual erection in 1995, to attract shop-

---

1. The sign was entitled "Salute to Liberty" and read: "During this holiday season, the city of Pittsburgh salutes liberty. Let these festive lights remind us that we are keepers of the flame of liberty and our legacy of freedom." *Allegheny*, 492 U.S. at 582, 109 S.Ct. at 3094.

pers to the downtown area and away from suburban malls. Finally, a reasonable observer would be aware that the City actively attempts to accommodate all groups' reasonable requests for additional displays and events during the holiday season.

We therefore agree with the district court that a reasonable observer would not perceive the crèche as a message of endorsement of Christianity. Such an observer would perceive a celebration of the diversity of the holiday season, including traditional religious and secular symbols of that season, and that a principal purpose of that celebration was to preserve the economic viability of downtown retailers. We therefore find no impermissible effect resulting from the display of the crèche in the setting described.

However, in addition to not having a primary effect of advancing or inhibiting religion, a statute or practice must not foster an excessive entanglement with religion and must have a secular purpose. *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2110–11, 29 L.Ed.2d 745 (1971). Elewski makes no claim of excessive entanglement. The district court found a secular purpose for the crèche as part of the entire display, and this finding is not clearly erroneous. The court credited evidence of a desire to bring the community together and to promote business. The crèche, by representing one of the origins of the holiday season, contributed to those goals. *Elewski*, 1996 WL 31169 at *7. We agree.

██ Turning from the general display of the crèche to its funding compared with that of the menorah, Elewski contends that full funding of the crèche while requiring partial reimbursement in the case of the menorah is discriminatory and should be subject to the strict scrutiny standard of *Larson v. Valente*, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). Whether Elewski has standing to raise this issue is anything but clear, but we see no cognizable discrimination. The funding of the crèche, while covering all costs, was less than the cost to the City of having

the menorah erected and lit. The fiscal solution reached was a reasonable accommodation in a situation in which the crèche was publicly owned while the menorah was erected by a private group that openly sponsored the display.

Finally, Elewski contends that the barricades with the mayor's name and "SPECIAL EVENTS" painted on them have the effect of endorsing the religious message of the crèche. We disagree. A reasonable observer would perceive the sawhorse barricades as entirely functional and not communicative of a message of religious endorsement.

## CONCLUSION

We therefore affirm.

JOSÉ A. CABRANES, Circuit Judge, dissenting:

Crèche cases are a familiar fixture of the holiday season, and the courts have often revisited the central question they present: When does a display of religious symbols rise to the level of "endorsement" of religion in violation of the Establishment Clause of the First Amendment? [1] I agree with the majority that we must address this question through the eyes of a "reasonable observer." *See Creatore v. Town of Trumbull*, 68 F.3d 59, 61 (2d Cir.1995) (per curiam). But in applying that legal rule to the facts of this particular case, I believe we are also compelled by binding precedents—most notably, *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995), *County of Allegheny v. ACLU*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), and *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984)—to hold unconstitutional the Syracuse crèche display. This publicly funded, publicly sponsored religious display on public property, situated in a major public park, emblazoned with a clearly sectarian message, and framed by police barricades bearing the name of the mayor and a municipal agency,

---

1. The Establishment Clause of the First Amendment reads as follows: "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I. By incorporation in the Fourteenth Amendment, the Establishment Clause also applies to state and local government actions. *Everson v. Board of Educ.*, 330 U.S. 1, 8, 67 S.Ct. 504, 507, 91 L.Ed. 711 (1947).

unavoidably signals to a reasonable observer public endorsement of religion.

It bears noting that the City of Syracuse overlooked a practical, common-sense solution that follows from the Supreme Court's most recent encounter with these difficult issues, *Capitol Square*, 515 U.S. at 753, 115 S.Ct. at 2440. Since the Court has indicated that privately sponsored religious displays in publicly owned traditional public forums are less likely to encounter constitutional problems than government-sponsored religious displays, *see Capitol Square*, 515 U.S. at 764–66, 115 S.Ct. at 2448 (plurality opinion); *id.* at 772–76, 115 S.Ct. at 2452–53 (O'Connor, *J.*, concurring); *id.* at 789–93, 115 S.Ct. at 2460–61 (Souter, *J.*, concurring), relying upon the initiative of private groups, rather than government entities, to erect holiday displays in such forums would help to extract municipalities and the courts from this constitutional thicket. The City opted, instead, for a much more direct and visible embrace of religion, and of one religious tradition over others. We cannot condone its actions without stretching controlling precedents to the breaking point. Accordingly, I respectfully dissent.

## I.

For some time, the Supreme Court's guidance on the Establishment Clause—often by fractured decisions and multiple concurring opinions—has been less than crystal clear. As a consequence, our courts are confronted with a steady stream of cases requiring them to engage in an ill-defined, fact-specific inquiry in "this extraordinarily sensitive area of constitutional law." *Lemon v. Kurtzman*, 403 U.S. 602, 612, 91 S.Ct. 2105, 2110, 29 L.Ed.2d 745 (1971).

In *Lemon*, the Court held that in determining whether a governmental action violates the Establishment Clause, courts must consider: (1) whether the challenged practice

has a secular purpose; (2) whether the practice either advances or inhibits religion in its principal or primary effect; and (3) whether the practice fosters excessive government "entanglement" with religion. *Id.* at 612–13, 91 S.Ct. at 2110–11.[2]

Years later, in *Allegheny*, 492 U.S. at 592–94, 601, 109 S.Ct. at 3100, 3105, the Supreme Court, following Justice O'Connor's concurrence in *Lynch*, 465 U.S. at 667, 104 S.Ct. at 1355 (O'Connor, *J.*, concurring), interpreted the second prong of the *Lemon* test by adopting the endorsement test, which "precludes government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred," *Allegheny*, 492 U.S. at 593, 109 S.Ct. at 3100 (internal quotation marks and alterations omitted), and prohibits "making adherence to a religion relevant in [some] way to a person's standing in the political community," *Lynch*, 465 U.S. at 667, 104 S.Ct. at 1355. In *Lynch*, the Supreme Court had found that a city-sponsored holiday display in a private park did not violate the Establishment Clause. We were reminded later that the holiday display approved by the Court in *Lynch* included, in addition to a crèche,

> a Santa Claus house with a live Santa distributing candy; reindeer pulling Santa's sleigh; a live 40–foot Christmas tree strung with lights; statues of carolers in old-fashioned dress; candy-striped poles; a "talking" wishing well; a large banner proclaiming "SEASONS GREETINGS"; a miniature "village" with several houses and a church; and various "cut-out" figures, including those of a clown, a dancing elephant, a robot, and a teddy bear.

*Allegheny*, 492 U.S. at 596, 109 S.Ct. at 3102 (Blackmun, *J.*, concurring).

In *Allegheny*, however, the Court applied the endorsement test and found that a crèche display did violate the Establishment Clause,

**2.** It has been suggested that the continuing vitality of the *Lemon* test may be uncertain. *See, e.g., Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 396–400, 113 S.Ct. 2141, 2148–50, 124 L.Ed.2d 352 (1993) (opinion of Scalia, *J.*, with Thomas, *J.*, concurring in the judgment) ("Like some ghoul in a late-night horror movie ..., *Lemon* stalks our Establishment

Clause jurisprudence.... Over the years ... no fewer than five of the currently sitting Justices have ... personally driven pencils through the creature's heart.... The secret of the *Lemon* test's survival, I think, is that it is so easy to kill. It is there to scare us (and our audience) when we wish it to do so, but we can command it to return to the tomb at will.").

while a Chanukah menorah display did not. The *Allegheny* crèche display was located on the Grand Staircase of the Allegheny County Courthouse. The crèche was surrounded by poinsettias and included an angel bearing a banner proclaiming *"Gloria in Excelsis. Deo!"* The menorah display, on the other hand, was under an arch outside another public building, a short distance away from the County Courthouse and next to a forty-five-foot Christmas tree decorated with lights and ornaments. At the foot of the Christmas tree, a sign was placed bearing the mayor's name and the message "Salute to Liberty." Beneath this message, the sign read:

> During this holiday season, the city of Pittsburgh salutes liberty. Let these festive lights remind us that we are the keepers of the flame of liberty and our legacy of freedom.

*Id.* at 581–82, 109 S.Ct. at 3094–95 (Blackmun, *J.*, concurring).

In the wake of *Lynch* and *Allegheny*, each of which contained multiple and conflicting opinions, lower courts have been required to engage in intensive fact-specific analyses to apply the endorsement test—analyses that Justice Kennedy predicted in *Allegheny* would amount to "a jurisprudence of minutiae" relying on "little more than intuition and a tape measure." *Id.* at 674–76, 104 S.Ct. at 1359–60 (Kennedy, *J.*, concurring in the judgment in part and dissenting in part). Although I am mindful of the difficulty of making these fact-specific determinations, I conclude that the display in the case before us conveys a message of government endorsement of religion and therefore cannot pass muster under the Establishment Clause. I believe that, in finding otherwise, the majority relies too heavily on the nature of other decorations throughout downtown Syracuse. While not entirely irrelevant, those other decorations are not sufficient to overcome the effect of perceived religious endorsement by the City that the crèche—containing an overtly sectarian slogan, sur-

rounded by municipal government barricades and appearing at the foot of the City's main Christmas tree display—would have upon a reasonable observer.

Another important factor in this case, although not by itself dispositive, is the sponsorship of the crèche by the City. As noted above, the Supreme Court's recent decision in *Capitol Square*[3] indicates that, in the view of a clear majority of the Court, publicly sponsored religious displays are more likely to run afoul of the Establishment Clause than privately sponsored displays. *See id.* 515 U.S. at 764–66, 115 S.Ct. at 2448 (plurality opinion written by Scalia, *J.*, for himself, the Chief Justice, and Justices Kennedy and Thomas); *id.* at 772–76, 115 S.Ct. at 2452–53 (O'Connor, *J.*, concurring, joined by Justices Souter and Breyer); *id.* at 789–93, 115 S.Ct. at 2460–61 (Souter, *J.*, concurring, joined by Justices O'Connor and Breyer); *cf. Separation of Church & State Comm. v. City of Eugene*, 93 F.3d 617, 626 (9th Cir.1996) (O'Scannlain, *J.*, concurring) (concluding that a government display of a cross as part of a war memorial on public land was unconstitutional, but suggesting that a different result might ensue if either the display or the land was privately owned).

Although the display's sponsorship does not necessarily or conclusively determine its constitutionality, it is a relevant and important factor in cases such as this one, where we are otherwise forced to rely on "minutiae" such as "tape measure[ments]" or the counting of reindeer, Santas, elves and other secular objects.

## II.

The majority adopts the district court's determination that the crèche display in the instant case is permissible under *Lynch* and *Allegheny*. *Ante*, at 54. I disagree. I believe that the district court misapplied *Lynch* and *Allegheny* to the facts of this case.[4] I disagree with the district court's conclusion,

---

3. In *Capitol Square,* the Supreme Court found that the Establishment Clause was not violated by the display of a Ku Klux Klan-sponsored Latin Cross, standing alone in a plaza surrounding the Ohio state capitol building that was traditionally used as a forum for public speech. *Capitol Square,* 515 U.S. at 756–58, 115 S.Ct. at 2444.

4. The district court's determination of "whether a government activity communicates endorsement of religion is not a question of simple historical fact.... [T]he question is ... in large part a legal question to be answered on the basis of judicial interpretation of social facts." *Lynch, 465 U.S. at 693–94, 104 S.Ct. at 1369–70 (O'Con-*

accepted by the majority, that the crèche display in this case was more similar to the menorah/Christmas tree display in *Allegheny* (which survived constitutional attack) than to the crèche display in *Allegheny* (which was held to be an unconstitutional endorsement of religion).

The majority apparently relies on the alleged similarity between the crèche display in the case before us and the menorah/Christmas tree display in *Allegheny,* and notes that the *Allegheny* menorah/Christmas tree display was stored, erected, and removed by the City of Pittsburgh. (I note that the *Allegheny* menorah itself, like the menorah in the instant case, was owned by Chabad Lubavitch, a private religious organization). There is, however, a critical distinguishing factor: the message of pluralism that the Supreme Court believed was conveyed by the menorah/Christmas tree display, *id.* at 635, 109 S.Ct. at 3123 (O'Connor, *J.,* concurring), and its secular context, *id.* at 613–21, 109 S.Ct. at 3111–15 (Blackmun, *J.,* concurring) (noting presence of sign linking holiday season with idea of liberty, and emphasizing fact that Christmas tree and menorah represent different holidays, thus creating an "overall holiday setting"). It is this distinction—this reliance on a secular context and a message of pluralism—that enabled the menorah/Christmas tree display in *Allegheny* to survive constitutional scrutiny, notwithstanding the fact that the City of Pittsburgh subsidized the display.

Here, in contrast, it seems to me difficult to argue that the crèche/Christmas tree display is "stress[ing] the theme of liberty and pluralism." *Id.* at 635, 109 S.Ct. at 3123 (O'Connor, *J.,* concurring). To the contrary, the crèche appears clearly to suggest the City's endorsement of Christianity. The crèche is placed in Syracuse's main downtown park; it is situated at the foot of the City's enormous Christmas tree; and it is surrounded by City barricades bearing the name of the mayor of Syracuse and a municipal government agency. Furthermore, as in the crèche display held unconstitutional in *Allegheny,* the crèche display here has a banner with the words "*Gloria in Excelsis Deo* "—words that the Supreme Court in *Allegheny* found to convey an unequivocally sectarian message.[5] *Id.* at 598, 109 S.Ct. at 3103 (noting that "[t]his praise to God in Christian terms is indisputably religious ... just as it is when said in the Gospel or in a church service").

The district court's erroneous analysis of the crèche display in the instant case was compounded by the fact that it focused its analysis too much on the holiday decorations throughout the greater downtown Syracuse area, rather than concentrating more specifically on the crèche display at issue. While I agree with the majority that "a reasonable observer is not one who wears blinders," *ante,* at 54, I believe that a reasonable observer would view the crèche, together with the Christmas tree, as a separate, clearly demarcated exhibit, distinct from any of the other holiday displays in the downtown area, and in a prominent position clearly indicating sponsorship by the City of Syracuse. In

---

nor, *J.,* concurring). Although the resulting decision is different, I believe that here, as in *Lynch,* the "District Court's conclusion concerning the effect of [the City's] display of its crèche was in error as a matter of law." *Id.* at 694, 104 S.Ct. at 1369.

Among other things, the district court erred by aligning itself with the dissent of Justice Kennedy in *Allegheny:* the idea asserted by the district court that the crèche display was an accommodation of religion was flatly rejected by the Supreme Court in *Allegheny,* see 492 U.S. at 601 n. 51, 109 S.Ct. at 3105 n. 51 (rejecting Justice Kennedy's characterization of the religious displays in that case as accommodations of religion), 613 n. 59; and the district court's reliance

on such cases as *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) (upholding state legislature's traditional practice of opening legislative session with prayer by paid chaplain) was misplaced, in view of the Supreme Court's treatment of *Marsh* in *Allegheny,* see 492 U.S. at 603, 109 S.Ct. at 3106 (criticizing Justice Kennedy's failure to "distinguish between a specifically Christian symbol, like a crèche, and more general religious references, like the legislative prayers in *Marsh* ").

5. The phrase "*Gloria in Excelsis Deo,*" which means "Glory to God in the Highest," comes from Luke 2:13–14 (King James Version). *See Allegheny,* 492 U.S. at 580 n. 5, 109 S.Ct at 3094 (Blackmun, *J.,* concurring).

viewing the relevant holiday display as consisting of the entire downtown area, the majority disregards the only explicit Supreme Court teaching addressing how broadly we ought to delineate or define the display under review, for purposes of the endorsement test. In analyzing the crèche display in *Allegheny*, the Court pointedly noted that

> [t]he presence of Santas or other Christmas decorations *elsewhere* in the county courthouse, and of the nearby gallery forum, fail to negate the endorsement effect of the crèche. The record demonstrates clearly that the crèche, with its floral frame, *was its own display distinct* from any other decorations or exhibitions in the building.

*Allegheny*, 492 U.S. at 598 n. 48, 109 S.Ct. at 3104 n. 48 (emphasis added). In the instant case, the record demonstrates that the crèche and the Christmas tree together, framed by City barricades, each bearing a reference to the City's mayor and to a City agency, "was its own display" distinct from any other decorations or exhibitions in the area. Nor were the decorations in Syracuse's Clinton Square (or, for that matter, even in downtown Syracuse as a whole) similar to those in *Lynch*, where a single park display contained numerous festive secular decorations. *See Lynch*, 465 U.S. at 670, 104 S.Ct. at 1358; *see also Allegheny*, 492 U.S. at 596, 109 S.Ct. at 3102 (Blackmun, *J.*, concurring). In Clinton Square there was only a crèche, a Christmas tree, and a few lights and wreaths. The remaining City-sponsored decorations in downtown Syracuse were sparse—consisting mainly of scattered lights, wreaths, and wire figures. A reasonable observer would view the crèche display as a distinct exhibit, and there were no other City-sponsored secular displays in the area whose presence would cumulatively dispel the impression that the City was endorsing Christianity by its prominent display of the crèche. In these circumstances, the district court should have considered more carefully the narrower question of whether the City's display of a crèche (alone) next to a Christmas tree in a prominent public place constitutes an endorsement of religion, not whether the display of a crèche, along with other holiday displays *throughout the greater downtown area*, constitutes an endorsement of religion.[6]

Moreover, to whatever extent a reasonable observer would examine the area surrounding the crèche display, such an observer could not help but notice that (as if to emphasize the City's apparent endorsement of Christianity through its prominent crèche display) a private menorah display appears nearby, down a side street in what seems to be a traffic circle, away from the main holiday display that appears in Syracuse's principal public square. The menorah display has no City barricades surrounding it, no references to the mayor of Syracuse nearby, and bears a sign clearly indicating that it is sponsored by a private organization which mounted the display. I believe that a reasonable observer would view the prominent, official display of the crèche in the main public square of Syracuse, coupled with the rather unobtrusive, private menorah display, tucked away on a side street, as further evidence of the government's endorsement of Christianity.[7]

### III.

The fact that the crèche display is sponsored by the City is surely relevant to any

---

6. In denying that the crèche display would suggest government endorsement of religion to a reasonable observer, the majority goes on to claim that such an observer would know that "downtown Syracuse merchants encourage the holiday display" and "that a principal purpose of the celebration [is] to preserve the economic viability of downtown retailers." *Ante*, at 54–55. The majority has in mind not a "reasonable, informed observer" but an omniscient observer, whose experience sweeps in not just what is visible to the naked eye or to an aware citizen of the community but the unseen closed-door meetings of local retailers and politicians as well.

7. To the extent that the City decides where the menorah display and the crèche display are to be placed, the City must avoid the appearance that the City is favoring the crèche display over the menorah display. *See Capitol Square*, 515 U.S. at 762–64, 115 S.Ct. at 2447 (stressing equal access to public space in finding that display did not violate Establishment Clause); *see also Allegheny*, 492 U.S. at 599–600, 109 S.Ct. at 3104–05 (stressing prominence of location of crèche, and lack of access of other groups to location, in finding it to be an impermissible endorsement of religion).

decision under the endorsement test. Although ignored by the district court, the Supreme Court's most recent "religious display" case, *Capitol Square*, relied on the distinction between government-sponsored expression and private expression. The plurality opinion by Justice Scalia (writing for himself, the Chief Justice, and Justices Kennedy and Thomas) and the concurring opinion by Justice O'Connor (writing for herself and Justices Souter and Breyer) both noted that "there is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Id.* 515 U.S. at 764–66, 115 S.Ct. at 2448 (plurality opinion) (internal quotation marks omitted); *id.* at 772–74, 115 S.Ct. at 2452 (O'Connor, *J.*, concurring) (internal quotation marks omitted).

While the plurality in *Capitol Square* found that the endorsement test enunciated and elaborated in *Lynch* and *Allegheny* did not apply to *private* religious displays in traditional public forums, virtually all of the Justices agreed that the endorsement test should apply to *government-sponsored* religious expression. *See Capitol Square*, 515 U.S. at 764–66, 115 S.Ct. at 2448 (opinion of Scalia, *J.*, with Rehnquist, *C.J.*, Kennedy and Thomas, *JJ.*, concurring); *id.* at 785–88, 115 S.Ct. at 2458–59 (opinion of Souter, *J.*, with O'Connor and Breyer, *JJ.*, concurring); *id.* at 797–99, 115 S.Ct. at 2465 (Stevens, *J.*, dissenting). Moreover, as the majority notes, *ante*, at 53–54, we have held that when interpreting *Capitol Square*, we look in particular to the "outcome determinative" concurring opinions of Justices O'Connor and Souter in that case, *see Creatore*, 68 F.3d at 61—and both of those concurring opinions indicate that whether a religious display is publicly or privately sponsored is relevant to the endorsement test.[8] *Capitol Square*, 515 U.S. at 774–76, 115 S.Ct. at 2453 (O'Connor, *J.*, concurring); *id.* at 785–87, 115 S.Ct. at 2458 (Souter, *J.*, concurring). The emphasis that these two "outcome determinative" opinions in *Capitol Square* placed on the private nature of the religious speech in question there, when read together with the plurality opinion of Justice Scalia, indicates that a clear majority of the Court would agree that government-sponsored religious displays on public property—while not *per se* unconstitutional—are more likely to fail the endorsement test than are private displays.[9]

8. Justice O'Connor also found that an important factor in determining whether a private display in a traditional public forum constitutes an endorsement of religion is "the presence of a sign disclaiming government sponsorship or endorsement on the ... cross, which would make the State's role clear to the community." *Capitol Square*, 515 U.S. at 774–76, 115 S.Ct. at 2453 (O'Connor, *J.*, concurring). Likewise, Justice Souter's concurring opinion favored the use of a sign disclaiming government sponsorship of private religious displays in a traditional public forum. *Id.* at 791–97, 115 S.Ct. at 2461–62 (Souter, *J.*, concurring).

9. In noting that the private sponsorship of a crèche on public property would be more likely to pass constitutional muster than a government-sponsored crèche, I am by no means suggesting that it would be appropriate, much less constitutional, for the City to *solicit* the private funding of religious displays. Rather, where there are strong and sincere religious sensibilities favoring displays of this kind—the very sensibilities that, joined with commercial interests, may have animated the City here, according to the majority—religious organizations and private groups affiliated with them (such as a local council of Christian churches or the Knights of Columbus in the case of crèches, and Chabad Lubavitch or other Jewish groups, in the case of menorahs) would surely be eager to assume on their own initiative the modest cost of such religious displays, receive appropriate recognition for doing so, and help forestall litigation of this sort. *Cf. Capitol Square*, 515 U.S. at 774–76, 115 S.Ct. at 2453 (O'Connor, *J.*, concurring) (noting importance of presence of sign clarifying private nature of display); *id.* at 791–97, 115 S.Ct. at 2461–62 (Souter, *J.*, concurring) (same). Similarly, if commercial enterprises see opportunities in sponsoring such displays during the holiday season, they too will surely seize them, while making it less likely that the City appears to endorse religion. As a general matter, the Supreme Court's teachings indicate that religious or other groups seeking space and time in these public areas can handle these matters on their own, largely without the need for government involvement, much less "entanglement," *see McCreary v. Stone*, 739 F.2d 716, 725 (2d Cir.1984) (noting that, in handling applications by religious groups to use public space, government "will have to do no more than when evaluating any other request for access to its public properties"), *aff'd by an equally divided Court*, 471 U.S. 83, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985), and thereby help make chronic and divisive litigation of this sort a thing of the past.

This is not to say that under *Capitol Square* the government may never sponsor displays with religious symbols.[10] Rather, the controlling precedents teach that the government may not sponsor religious displays where the overall context of the display conveys a message of endorsement of religion.

Accordingly, in light of *Lynch, Allegheny,* and *Capitol Square,* I am persuaded that the crèche display in the case before us violates the Establishment Clause.[11]

## IV.

I respectfully dissent because I conclude that the crèche display in this case fails the endorsement test enunciated by the Supreme Court under the Establishment Clause of the First Amendment.

---

10. Clearly there would be no Establishment Clause violation, for example, in the government's sponsorship of the display of religious artwork at "a governmentally supported museum[ ]." *See Lynch,* 465 U.S. at 683, 104 S.Ct. at 1364.

11. Although the majority claims that the City also paid $460 to fund the menorah display, for which it was not reimbursed by Chabad Lubavitch, *ante* at 53, that information, even if true, is not a part of the record before us. *See Thomas E. Hoar, Inc. v. Sara Lee Corp.,* 900 F.2d 522, 526 (2d Cir.1990) (refusing to consider contention on appeal, "[i]n view of the dehors the record factual nature of [the claim]"). That information, if true, is arguably less significant than the government's sponsorship of the crèche display in the instant case because, given the presence of a sign indicating private sponsorship of the menorah display and the modest and marginal nature of the display, it is less likely that a reasonable observer would regard the display as a government endorsement of religion. In any event, because appellant has not challenged the City's funding of the menorah, we need not consider this question on appeal.