NYGAARD, Circuit Judge,
dissenting.
I have two reasons for dissenting. First, I dissent because I believe that the argument urged upon us by appellant undermines our earlier decision in this case. Following Sehundler I, addressing the original display, I still conclude that the addition of a few small token secular objects is not enough to constitutionally legitimate the modified display. Although appellant strives mightily to explain what we did not hold in Sehundler I, I believe it more important to determine what we did hold. We explicitly held that the display at issue here, minus Frosty, Santa, the sleigh, and the Kwanzaa symbols, was unconstitutional because it had the effect of communicating an endorsement of particular religions. So, I submit that the real question now is whether simply adding Kwanzaa symbols to the tree and placing Frosty (a secular symbol of Christmas), Santa (a once-religious symbol — St. Nicholas — now quite secularized), and a sleigh in the display sufficiently changed the display’s context so as to negate the message that was conveyed by the original display, which we held unconstitutional.
The second, albeit weaker, reason why I dissent is that although the majority cites the applicable Supreme Court case law to reach its conclusion that this display is constitutional, parsing the same law and applying it to these facts leads me to the opposite conclusion. There is, I readily acknowledge, much confusion and plenty of room for jurisprudential disagreement in this area. No bright lines of demarcation have .been drawn between religious “establishment” and simple display, and perhaps none of. us is capable of accurately drawing such a line given the state of the case-law. I am afraid that the shifting majorities and fact-specific opinions of the Supreme Court in Lynch and Allegheny County provide only a precarious analytical framework for both .the. public and. we inferior federal courts to apply in determining the exact location of the line of demarcation.
The Supreme Court’s two major recent excursions into this area have resulted in fractured majorities and no clear statement of the law. Nonetheless, it seems to me that the Court has directed us to evaluate religious symbols in the context of the entire display. As we noted in Sehundler I, “the Supreme Court, in its myriad of approaches in the display cases, has repeatedly emphasized the importance of examining the context of the display at issue to determine whether it has the effect of endorsing religion.” SChundler I, 104 F.3d at 1451. We reaffirmed the significance of context when we examined Allegheny County and Lynch “to illustrate ‘the importance of the context of a challenged practice’ in conducting an Establishment Clause analysis.” Id. (quoting ACLU v. Black Horse Pike Regional Bd. of Educ., 84 F.3d 1471, 1484 (3d Cir.1996) (en banc)). Following the Supreme Court’s decisions in Lynch and Allegheny County, I con- ■ elude that Jersey City’s modified display resulted in an unconstitutional establishment of religion.
A. Lynch
First, our display is unlike the display that the Supreme Court allowed in Lynch. The majority sees “no reasonable basis,” other than the different locations of the displays, “for distinguishing the modified Jersey City display from the display upheld in Lynch.” Majority Opinion at 104. I believe that this analysis of the display fails to adequately credit the different contexts of the two displays. When looked at in its context, I believe that the constitutional display in Lynch is distinguishable. The display approved by *110 the Court in Lynch included, in addition to a creche (the only religious symbol),
a Santa Claus house with a live Santa distributing candy; reindeer pulling Santa’s sleigh; a live 40-foot Christmas tree strung with lights; statues of carolers in old-fashioned dress; candy-striped poles; a “talking” wishing well; a large banner proclaiming “SEASONS GREETINGS”; a miniature “village” with several houses and a church; and various “cut-out” figures, including those of a clown, a dancing elephant, a robot, and a teddy bear.
Allegheny County, 492 U.S. at 596, 109 S.Ct. at 3102 (opinion of Blackmun, J.). The Court in Allegheny County noted that the Lynch display was composed of a series of figures and objects, each group of which had its own focal point. See id. at 598, 109 S.Ct. at 3104 (opinion of the Court). The various objects each had a separate “visual story to tell.” Id. at 598, 109 S.Ct. at 3104.
Contrasting the Lynch display, with its “superabundance of secular symbols [which] dilute[d] the message of the creche,” Amando v. Town of Somerset, 28 F.Supp.2d 677, 681 (D.Mass.1998) (finding display consisting of a creche, holiday lights, a wreath, a Christmas tree, and a plastic Santa Claus unconstitutional), with the Jersey City display reveals a different context. Here, rather than a “superabundance” of secular objects, only a handful of nonsectarian objects were placed in the display, none of which, other than the Christmas tree, could have reasonably been considered a separate focal point. I would not underestimate the essential importance to the Supreme Court majority of the numerous secular objects surrounding the creche in Lynch . As the Second Circuit Court of Appeals noted,
After Allegheny and Lynch, therefore, not every city-owned-and/or-displayed creche violates the Establishment Clause. Lynch squarely upheld a city’s erection of a creche that it owned as part of its Christmas display in a park owned by a nonprofit organization. A key factor leading to that conclusion, especially in light of the later Allegheny decision, was that the créche was only a small part of an otherwise secular display.
Elewski v. City of Syracuse, 123 F.3d 51, 54 (2d Cir.1997) (upholding a holiday display of a eréche in light of the context) (emphasis added) (citations omitted), cert. denied, — U.S. -, 118 S.Ct. 1186, 140 L.Ed.2d 317 (1998). Although I disagree with the Elew-ski opinion in light of Lynch, nonetheless even if we apply its reasoning to the Jersey City display, the creche and menorah were certainly not “small parts” of an otherwise secular display. The only reasonable interpretation, as we noted in Schundler I, is that Frosty and Santa composed a small secular part of an otherwise sectarian display, not the other way around.
Rather than the seasonal, “winter wonderland” scene in Lynch, Jersey City erected a display that a reasonable observer would interpret as having three symbolic focal points: the creche, the menorah, and the Christmas tree.[1] The same three focal points that were found to result in an unconstitutional endorsement of religion by this Court in Schundler I.[2] Indeed, the modified display *111 perhaps provides a more substantial example of endorsement than the original display because the characters of the creche were removed from their isolated, sheltered position in the manger to a more prominent position beside it. See Schundler I, 104 F.3d at 1439. Compared to the display in Lynch, the Jersey City display had more and larger sectarian symbols combined with fewer secular symbols. This created a different context and resulted in a different message, one of government endorsement of religion.
B. Allegheny County
Nor do I think that Allegheny County supports the conclusion that the Jersey City display was constitutional. It can be argued that, when looking at the secular and sectarian elements, the balance seems to have been “roughly” the same in the Jersey City display and the Allegheny County display located on the front steps of the City-County Building. I think that statement underestimates the importance of the context of the display by eliding the difference in the size and location of the various elements. In Allegheny County, the 45’ tall Christmas tree was “clearly the predominant element in the city’s display” on the steps of the City-County Building. Allegheny County, 492 U.S. at 617, 109 S.Ct. at 3113 (opinion of Blaekmun, J.). The tree dwarfed the 18’ tall menorah, which was placed to the side of the tree’s central position beneath the middle archway in front of the building. See id. This clearly contrasts the Allegheny County display with the Jersey City display in which, on both sides of the display, the “predominant” element was sectarian.
Although not determinative, a display’s location informs the constitutional analysis. As Justice O’Connor stated in Allegheny County, “[t]he display of religious symbols in public areas of core government buildings runs a special risk of ‘mak[ing] religion relevant, in reality or in public perception, to status in the political community.’ ” 492 U.S. at 626, 109 S.Ct. at 3119 (O’Connor, J., concurring) (alteration in original) (quoting Lynch, 465 U.S. at 692, 104 S.Ct. at 1369 (O’Connor, J., concurring)). When dealing with the original display in the exact same location in Schundler I, we stated,
When a government chooses to speak by erecting a créehe on government property, the principles at the core of the Establishment Clause are clearly implicated. By erecting the creche itself, on city property, a city sends a stronger message of endorsement of religion than when it merely provides a forum for private religious speech. In the former context, the government is effectively conveying the message that “we celebrate the holiday season by recognizing the birth of Christ.”
Schundler I, 104 F.3d at 1445 (citation omitted). What is clear then is that when a display containing religious elements is located in front of the main city government building, we should recognize that the possibility of sending a message of religious endorsement to the reasonable observer is augmented.[3]
We must not overlook an important basis of our decision in Schundler I: In finding the display unconstitutional, we relied on the fact that Jersey City used public funds to own, erect, and maintain the creche and the menorah. Although not a deciding factor, we noted that “by using taxpayer dollars to fund a display containing religious symbols, Jersey City has increased the risk that the display’s religious message will be attributed to the city and its taxpayers.” Id. at 1445-46; see also Elewski, 123 F.3d at 57 (Cabranes, J., dissenting) (noting that government sponsorship is “a relevant and important factor”). The modified display here is subject to the same infirmity.
In Allegheny County, the Court allowed a display containing only a menorah and a Christmas tree. We, however, have found that when a creche and a menorah are dis *112 played together, “the menorah’s religious significance is emphasized.” Schundler I, 104 F.3d at 1446. In Allegheny County, Justice O’Connor found that, even though the religious message of the menorah was not entirely neutralized, any message of government endorsement was negated by the presence of the much larger Christmas tree. See Allegheny County, 492 U.S. at 635, 109 S.Ct. at 3123 (O’Connor, J, concurring). In Jersey City, however, the religious aspect of the menorah was underscored by the rest of the display.[4] In this case, the menorah is more reasonably viewed in light of the presence of the creche, not the tree. In Allegheny County, the menorah outside the City-County Building was privately owned and its religious message was not accentuated by the additional presence of a creche representing the stable wherein Jesus was born. These facts distinguish the Allegheny County display from this one.
To support its argument that no sectarian message was delivered, appellant points to the two signs proclaiming that the display was part of a year-round celebration of diversity. The value of the signs should be considered in light of, and is wholly negated by, the fact that the original display we held unconstitutional contained the same sign. Furthermore, the sign clearly states that Jersey City is supporting the display, removing any doubt from the reasonable observer’s mind concerning whether the display was private speech or government speech. Although informative, the mere presence of signs stating that the display was part of a celebration of ethnic and cultural differences does little to negate the impact of the sectarian message.[5]
Appellant argues that Schundler I incorrectly determined that a reasonable observer would not be aware of Jersey City’s other celebrations throughout the year. Assuming arguendo that the earlier panel was incorrect, looking at the history of this display and others in Jersey City does little to save the modified display from its message. I am not exactly sure what a reasonable observer would think. I doubt, however, that he or she would question long why the creche and menorah were on the City Hall lawn before concluding that it was to celebrate Christmas and Hanukkah. I also think that the reasonable observer, looking at the modified display, would be aware of the various ethnic and cultural celebrations throughout the year. In addition, the reasonable observer would likely know that no other religious celebrations occurred in front of City Hall. The reasonable observer would see that the display is larger than any other display in front of City Hall. The reasonable observer would realize that the display was in place longer than any other display, secular or sectarian, that occupied the very visible space in front of City Hall.[6] Finally, the reasonable observer' would likely remember that for approximately thirty years, Jersey City had erected a virtually identical display that we found endorsed religion in violation *113 of the First Amendment of the United States Constitution.
After thirty years of religious promotion by Jersey City in front of City Hall, the reasonable observer would likely see the addition of the secular figures, which “lacked the physical sturdiness and careful positioning of the religious symbols,” Dist.Ct. at 10, as we saw them in our previous opinion — • “token additions” which do little to “secularize” the “conveyed ... message of government endorsement of religion.” Schundler I, 104 F.3d at 1452 & n. 19 (noting the “artful! ]” argument of the ACLU that the reasonable observer would no doubt characterize the additional figures as “attempts at evasion of constitutional prohibitions through superficial secular tokenism”); see also Dist.Ct. at 10 (finding that the addition of the secular symbols was “a ploy designed to permit continued display of the religious symbols”); ACLU v. City of Florissant, 17 F.Supp.2d 1068, 1075-76 (E.D.Mo.1998) (finding, on similar facts, that adding secular figures to a previously sectarian display did not “negate or muffle the earlier message of endorsement”). I am aware of no Supreme Court holding that allows the government to make a religious pronouncement at Christmas and Hanukkah as long as it has made a sufficient number of secular pronouncements at other times of the year. Although Jersey City certainly has separate ethnic and cultural celebrations, this does not obscure the fact that for several weeks of every year, the city government erected a display that communicated a religious message. The Supreme Court’s interpretation of the First Amendment simply does not allow.the government to do that.
C. Lack of Supreme Court Standard
This case, after four years of litigation, underscores what I stated earlier about the problems with the standards and analyses provided by the Supreme Court in this area. In the course of this litigation, we have twice been asked to evaluate the constitutionality of two virtually identical displays. We have come to two directly opposite conclusions. What has resulted is an intra-circuit split in the truest sense of the phrase.
The inconsistent results in this Court can be directly attributed to the insufficient and inconsistent guidance given to the inferior federal courts — or, perhaps as I earlier mused, the behavior at issue here is incapable of being guided. In both Lynch and Allegheny County, the Supreme Court could not agree on the correct analysis, much less the correct application of a standard to the facts. After Capitol Square Review & Advisory Board v. Pinette, 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995), it now appears that a majority of the Supreme Court has at least accepted that government-sponsored religious speech should be evaluated under the endorsement test. Until the Supreme Court decides a case in which a majority opinion of the Court utilizes a clear test to analyze a religious display, we are left with fact-specific inquiries that focus on the size, shape, and inferential message delivered by displays with religious elements, leaving almost any display that has a religious symbol in it open to challenge and any such display that has secular elements, no matter how trivial, open to judicial approval.
Unfortunately, Justice Kennedy’s prediction in Allegheny County has come true. “[A] jurisprudence of minutiae” relying on “little more than intuition and a tape measure” has resulted from the unclear analyses contained in the various opinions of the Supreme Court. Allegheny County, 492 U.S. at 674-76, 109 S.Ct. 3086 (Kennedy, J., concurring in the judgment in part and dissenting in part).
D. Lack of Consistency
Were the foregoing the only reason for my disagreement, I may not have written a dissent; or if so, it would may well have suffered the same end as most others I write. However, there is another aspect of this ease — the fact that we have already addressed the display at issue here, and that, in my opinion, the majority’s opinion slices our earlier holding too thinly. As I noted earlier, in light of the holding in Schundler I, the only question for us today is whether the additions of Santa, Frosty, a sleigh, and some Kwanzaa ribbons rehabilitate a display that we held to be an unconstitutional endorse *114 ment of religion. The majority, however, goes beyond this issue to question the central holding and reasoning underlying an earlier opinion of this Court — a dose reading of the majority’s holding reveals that the decision does not only rely on the presence of the figures or the Kwanzaa ribbons. Therefore, the majority would effectively overrule one of our own opinions: a task reserved for the en banc Court. Although this event would be cause for alarm in any case, my dismay is heightened here where the second opinion emanates from the exact litigation as the first. In this instance, the concern for the consistency of the law and the legitimacy our jurisprudence is intensified. Of course the law of religious displays is characterized by intensive fact analysis and questionable line drawing, and it is possible to disagree with our prior holding and analysis; however, to protect the integrity of our jurisprudence, I cannot condone the appearance of one panel overruling another.
We have the duty not only to review cases and point out error, but also to provide guidance. We cannot ask others to respect the integrity of our decisions when we ourselves do not; but instead evade the reasoning of a prior panel in the same case. This case is unique in that we have already expressed our views on the precise issue and nearly identical facts that are the subject of this appeal. We stated, albeit in dictum, when addressing the exact display at issue here, that
[t]he token additions of the secular symbols do little to alter the “context” or the focal points of the City’s display. We reiterate that Jersey City’s display of the creche at the seat of City government power impermissibly conveyed a message of government endorsement of religion. And, in our view, the City’s addition of Santa, Frosty, and a red sled did little to secularize that message.
Schundler I, 104 F.3d at 1451. Although dictum, the language fulfills our responsibility to instruct and guide the District Court.
On remand, the District Court scrupulously followed our instructions and reasoning and determined that the modified display violated the Establishment Clause. The District Judge made this determination, even though he may not have agreed with it, because he felt duty-bound, in an area of law fraught with uncertainty, to follow what he perceived to be the instructions we had given him. Now, reexamining the same display almost two years after Schundler I, this Court finds that the addition of the figures of Santa and Frosty, who was lashed to a tree next to the sleigh, do in fact neutralize the unconstitutional message of endorsement that had been conveyed by Jersey City for three decades and reverses itself concerning the appropriateness of our earlier instructions. This constitutional about-face in the same case troubles me greatly, strikes to the core of the'legitimacy of our jurisprudence, and exposes us to well-earned criticism for inconsistency and for giving insufficient respect to an earlier instruction by the Court.
E. Conclusion
I conclude that the message of this display remains the same as that of the original display. On one side, the menorah and the Christmas tree tower over the Santa Claus. On the other side, a manger, representing the site where Jesus was born, dominates the scene. Next to the manger, a cart and a nativity scene reflect the action that myth says surrounded the birth of Jesus. Off to the side is the sleigh, and the snowman is placed behind and to the side of the scene. The dominant element of each side of *115 the display is a religious symbol. Looking at the display as a whole, rather than focusing on only those elements that were also present in the constitutional displays in Lynch or Allegheny County, it seems to me that the dominant message of the display is an endorsement of religion.
By underestimating the importance of the size, location, and number of the secular elements of the display, we have now essentially given governments free reign to design their religious displays in as sectarian a manner as possible. In addition, if the government should happen to cross the line and convey an unconstitutional message, it needs merely to add one or two more token secular figures and try again. I do not think this is the proper message to deliver.
*116 ATTACHMENT
APPENDIX A
[[Image here]]
*117 APPENDIX B
[[Image here]]
*118 APPENDIX C
[[Image here]]

. Appellant argues that because the tree was comparable in size to the menorah, it created a separate focal point. This argument is irrelevant in light of our holding in Schundler I. In that case, we expressly held that the presence of the Christmas tree did not make the display constitutional. In Schundler I, we determined that the Christmas tree had a secular effect, and the mere addition of ICwanzaa ornaments to the tree certainly does little to enhance the already secular effect.
In addition, applying a sort of Blackmun yardstick test, appellant appears to argue that the 4’ tall Santa and the 3’ 10” tall Frosty created separate focal points that operated to neutralize the sectarian message conveyed by the 14' tall menorah and the over 45’ square, 7’ tall manger with a separate nativily scene. The snowman was located to the back left of the manger, approximately 35 feet away from the manger. See App. 48. Santa Claus, on the other hand, was located across the walkway, situated between the 13’ tall tree and the 14’ tall menorah. These token figures simply did not substantially detract from the unconstitutional sectarian message conveyed by the original display. See Schundler I, 104 F.3d at 1452.

. We also placed a great deal of emphasis on the location of the display on the front steps of City Hall in Schundler I. I will follow the majority's lead and discuss this aspect of the case when dealing with Allegheny County.

. Justice O'Connor approved the display in Allegheny County that was situated on the steps of a government building. Since she allowed that display, it can be argued that the location of the Jersey City display does not in itself provide a valid basis for holding the display to be unconstitutional. Although I agree that this factor alone does not justify finding a display to be unconstitutional, it is certainly an aspect that should be taken into account when determining the message conveyed by the display.

. It can be argued that Justice O’Connor’s opinion in Allegheny County seems to rebut Justice Blackmun’s argument in the same case that a menorah is an inherently less religious symbol than a creche. I am not sure I agree with that because when a reasonable observer sees a menorah what would she or he think of except the miracle of the oil, or of the holy candelabrum in the Jewish Temple, and of the Jewish Festival of Lights. Moreover, although the religious impact of a menorah standing alone was debatable, at least by the members of the Supreme Court, we have found that the combination of a menorah with a creche communicates a clearly sectarian message. See Schundler I, 104 F.3d at 1446.

. As Justice Blackmun stated, “The simultaneous endorsement of Christianity and Judaism is no less constitutionally infirm than the endorsement of Christianity alone.” Allegheny County, 492 U.S. at 615, 109 S.Ct. at 3112 (opinion of Black-mun, J.)

.From my examination of the record, the only evidence of other displays erected by Jersey City in front of City Hall comes from the deposition of the mayor, Bret Schundler.'
Q. Apart from the menorah and the nativity scene, can you recall any other displays erected on the city’s initiative that have been erected in front of City Hall?
A. I’m sure there have been.
Q. Do you have any specific recollections of any examples, as we sit here today?
A. We have had memorial week out there, we have flags out there, as you know, which is right in front of City Hall, celebrating every group under the sun.
App. 160.