**Bertram COOPER, Plaintiff,**

v.

**UNITED STATES POSTAL SERVICE, et al., Defendants.**

No. 3:03CV01694(DJS).

United States District Court, D. Connecticut.

April 18, 2007.

Renee Colette Redman, American Civil Liberties Union, Hartford, CT, Suzanne Ellen Wachsstock, Wiggin & Dana, Stamford, CT, for Plaintiff.

Douglas P. Morabito, U.S. Attorney's Office, New Haven, CT, for Defendants.

### MEMORANDUM OF DECISION AND ORDER

SQUATRITO, District Judge.

Plaintiff, Bertram Cooper ("Cooper") brings this action for declaratory and in-

junctive relief against Defendants United States Postal Service ("the Postal Service"), John E. Potter ("Potter"), and Ronald G. Boyne ("Boyne") (collectively, "the Defendants"), and against Intervenor Defendants Full Gospel Interdenominational Church, Inc. ("the Church"), Dr. Philip Saunders Heritage Association, Inc. ("the Association"), and Sincerely Yours, Inc. ("SYI") (collectively, "the Intervenor Defendants"), alleging violations of his rights, and the rights of all citizens, under the Establishment Clause of the First Amendment to the United States Constitution. Now pending are the Defendants' Motion for Summary Judgment (**dkt.# 38**) and Cooper's Motion for Summary Judgment (**dkt.# 41**).[1] For the reasons stated herein, the Defendants' motion (**dkt.# 38**) is **GRANTED in part and DENIED in part,** and Cooper's motion (**dkt.# 41**) is **GRANTED in part and DENIED in part.**

## I. FACTS[2]

This case involves whether, and to what extent, it is constitutional for the Postal Service to allow a religious organization to operate a business known as a contract postal unit ("CPU"), which, pursuant to a contract with the Postal Service, provides certain postal services to the public. At all times relevant to this case, the following information applies: Cooper is a natural person residing in Manchester, Connecticut. Defendant Potter is Postmaster General of the United States, which is the chief executive officer of the Postal Service. *See* 39 U.S.C. §§ 202(c), 203. Defendant Boyne is the Postmaster of the

Manchester, Connecticut post office. Intervenor Defendant the Church, a religious organization, originally signed the contract with the Postal Service for a CPU to be located on private property at 1009 Main Street in Manchester, Connecticut; this contract was subsequently transferred to Intervenor Defendant SYI, a Connecticut not-for-profit corporation that operates the CPU on private property in Manchester. The Association, also a Connecticut not-for-profit corporation, was organized to hold the real estate of the Church, and is the titleholder and landlord to the real estate located at 1009 Main Street in Manchester, Connecticut.[3]

## A. THE POSTAL SERVICE AND CONTRACT POSTAL UNITS

The Postal Service, which derives its authority from the Constitution of the United States, *see* U.S. Const. art. I, § 8, cl. 7, acts as an independent establishment of the executive branch of the federal government, *see* 39 U.S.C. § 201. The general duties of the Postal Service are to plan, develop, promote, and provide adequate and efficient postal services at fair and reasonable rates and fees, and to receive, transmit, and deliver written and printed matter and parcels throughout the United States and the world. *See* 39 U.S.C. § 403. Congress has bestowed the Postal Service with the power "to provide and sell postage stamps and other stamped paper, cards, and envelopes and to provide such other evidences of payment of postage and fees as may be necessary or desirable." *Id.* § 404(a)(4).

---

1. The court notes that the Intervenor Defendants have joined and adopted both the Defendants' motion for summary judgment and the Defendants' opposition to Cooper's motion for summary judgment. (*See* dkt. # s 59 & 60.)

2. Based upon the parties' submissions to the court, there appear to be no genuine issues of

material fact requiring trial. Instead, the parties indicate that this case presents a purely legal issue that should be decided on summary judgment.

3. The sole incorporator of both SYI and the Association was the Reverend Eleanor Kalinsky ("Reverend Kalinsky") of the Full Gospel Interdenominational Church, Inc.

In certain circumstances, the Postal Service enters into contracts establishing CPUs, which are distinguishable from traditional, government-run "official" post offices (also known as "classified units") staffed and operated by Postal Service employees. The Postal Service's Glossary of Postal Terms defines a CPU as

a postal unit that is a subordinate unit within the service area of a main post office. It is usually located in a store or place of business and is operated by a contractor who accepts mail from the public, sells postage and supplies, and provides selected special services (for example, postal money order or registered mail).

(Dkt.# 49–B, Ex. 16.) CPUs are operated by persons who are not postal employees. (*See id.*, Ex. 20.) CPUs are not permitted to provide products from competing services such as Federal Express or the United Parcel Service, but they may conduct non-postal business on the premises in an area that is separate and distinct from the postal products. All postal funds must be kept separate from the non-postal funds.

The Postal Service relies upon CPUs to bring postal services to areas in which the Postal Service has determined that the establishment of a classified unit would be unfeasible. There are approximately 5,200 CPUs nationwide, and they are currently operated in, among other places, colleges, grocery stores, pharmacies, quilting shops, and private residences. The Postal Service has represented that there are several CPUs being operated by institutions and groups with religious affiliations.

The Postal Service asserts that CPUs are more cost-effective than classified units because CPUs offer the same products as classified units, but without the costs (e.g., employee salaries and benefits) associated with classified units. Contracts for CPUs usually come in two varieties, performance-based contracts and fixed-price contracts. A performance-based contract is a contract in which the supplier is paid in relationship to how much revenue the CPU generates. Some factors for determining the percentage that a supplier will receive under a performance-based contract are: the competition in the area; the need in the community; and the cost for operating that particular CPU. A fixed-price contract is a contract in which the supplier receives twelve monthly payments per year to reflect the annual rate, regardless of the amount of revenue the CPU generates. The Postal Service prefers performance-based CPU contracts.

The decision to open a CPU starts at the local level, where issues such as the length of the wait lines at classified units, area need, cost, and competition are considered. Once it has been determined that a particular area is in need of a CPU, there is an approval process from the local level to the Postal Service's district office. The Postal Service then engages in a solicitation and evaluation process whereby the Postal Service solicits bids from the community for CPU locations. The Postal Service receives and evaluates the bids. Selection for the awarding of a CPU contract is based on a formula regarding a "business score" and a "price score," and the standard criteria used in evaluating CPU proposals are: suitability of location, suitability of the facility, and ability to provide services.

Each CPU has a contracting officer representative appointed to oversee that CPU. The contracting officer representative is responsible for administering the contract. Once a CPU contract has been awarded, the contracting officer representative has the responsibilities of conducting on-site reviews, performing an annual review of the CPU's bond, conducting periodic financial reviews with an annual audit, and reviewing the operating/service hours

at the CPU. There is no required schedule that a contracting officer representative must keep with regard to a CPU, although he must conduct on-site reviews "periodically."

## B. THE SINCERELY YOURS, INC. CONTRACT POSTAL UNIT

Boyne, who is a member of the Church, has been the Postmaster for the Town of Manchester since 1998. Boyne has been trained to oversee CPUs and has acted as a contracting officer representative on several occasions at various CPUs; however, he has testified that he spends minimal time on CPU matters. Before the CPU contract was awarded to the Church (which was later transferred to SYI), the Town of Manchester had two prior CPUs in operation, the Weston Pharmacy CPU and the Community Place CPU, which provided postal services to a large contingent of the Manchester community for whom the trek to the classified Manchester Post Office was too burdensome or inconvenient. Boyne was the contracting officer representative for the Community Place CPU from 1998 through October 2001, when the Community Place CPU closed.

Eight months prior to closing, the Community Place CPU gave the Postal Service notice of its closing. There was substantial community interest generated by this closing, as the community sought to find a suitable replacement. Although the Postal Service considered establishing a second classified unit in Manchester, it ultimately decided to contract for a new CPU. The Postal Service immediately began a search to find a site that would replace the Community Place CPU. This search included the solicitation of proposals for a new CPU, and the Postal Service sent solicitations throughout the Manchester community. Boyne states that he met with the mayor of Manchester, "two congressmen and the senator,"[4] the board of directors for the Town of Manchester, and the Manchester Downtown Council regarding the replacement CPU. Two organizations submitted bids to operate the replacement CPU: Manchester Hardware, Inc. ("Manchester Hardware") and the Church. Apparently, before the Church and Manchester Hardware submitted their competing bids, Manchester Hardware had submitted previous bids, which the Postal Service rejected. The Postal Service evaluation committee for the CPU bids submitted by Manchester Hardware and the Church consisted of Denise Adessa, Tony Impronto, and Mark Kielbasa. This committee gave the Church a higher suitability score than Manchester Hardware,[5] and on November 20, 2001, the Postal Service awarded the CPU contract to the Church. Boyne was not involved in the evaluation, selection, or award of the CPU contract to the Church. On October 9, 2003, the Church and the Postal Service modified the CPU contract by replacing the Church with SYI, a corporation set up by the Church for the purpose of establishing the CPU, and SYI began to run the CPU ("the SYI CPU").

Pursuant to the terms of the SYI CPU contract, the interior and exterior of the SYI CPU premises are to be kept clean, neat, uncluttered, and in good repair. The SYI CPU must contain signage indicating that the establishment is a contract postal unit and providing the address of the nearest Postal Service Administrative Office.

---

4. In the portions of Boyne's deposition testimony that were submitted to the court, Boyne does not identify these three legislators by name. (*See* dkt. # 40, Ex. 4, Boyne Dep. at 29:11–12.)

5. Cooper admits that Manchester Hardware's bid was higher than the Church's bid.

All money collected at the SYI CPU is the property of the Postal Service, and all payments to SYI by the Postal Service are made in arrears after each Postal Service accounting period. As part of the SYI CPU contract, the Postal Service was required to pay for, among other things, the build-out of the SYI CPU counter and the construction of post office boxes at the SYI CPU. SYI was to pay for all other renovations to the building that housed the SYI CPU. Under the terms of the SYI CPU contract, SYI receives, as compensation, 18% of all sales made at the SYI CPU and 33% of all post office box rental proceeds. As the contracting officer representative, Boyne (or one of his supervisors) conducts periodic on-site reviews of the SYI CPU to ensure that SYI is in compliance with the contract; Boyne's contact and oversight of the SYI CPU is, however, minimal. SYI runs the day-to-day operations of the SYI CPU, and SYI has the authority to hire and fire its CPU employees. SYI pays for its employees to receive training from the Postal Service with regard to running a CPU; this training includes learning about accounting procedures and equipment operation. SYI employees do not, however, wear Postal Service uniforms.

## C. DISPLAYS IN THE SYI CPU

As stated above, the Church is a religious organization. Pursuant to the Church's charter, the Church's mission is to "engage in the preaching of the Gospel of Jesus Christ in the State of Connecticut[,] ... the United States and ... foreign lands." In addition, "It shall be the object of [the Church] to establish[,] among other things[,] Churches, whenever and wherever possible, for the advancement of the kingdom of Jesus Christ" and to "send forth preachers and workers whose principle [sic] objective shall be to promote the Kingdom of the Lord Jesus Christ...." (Dkt. #49–B, Ex. 2 ¶1(b).)

The SYI CPU contains both religious and non-religious displays. The exterior wall of the SYI CPU, which faces the street, has a label with the stylized eagle of the Postal Service indicating that the premises contains a Postal Service contract postal unit. The sign over the threshold to the building reads "Sincerely Yours." Another sign on the outside of the SYI CPU reads, in cursive type, "Sincerely Yours, Inc." and, in print type, "United States Contract Post Office."

The interior of the SYI CPU contains evangelical displays, including posters, advertisements, artwork, and photography, which change at various times during the year. Upon entering the SYI CPU, a postal counter, built by the Postal Service, sits immediately to the customer's right; behind the counter is a slat wall, also built by the Postal Service. In their submissions to the court, the parties describe the religious displays in the SYI CPU as follows:

(1) On the wall directly to the right of the postal counter and slat wall is a large religious display that informs customers about Jesus Christ and invites them to submit a request if they "need prayer in their lives." Specifically, this display states:

Do you or someone you know need prayer? At this very moment someone is praying in our 24 hour Prayer Tower and we would love to pray for you. Please drop your request into our confidential prayer box, or if you would prefer to speak to someone personally, call our Church office.

Once your need has been answered, we'd be so happy to hear from you. Please call our Church office ... and let our receptionist know that God has answered your prayer.

"Trust in him at all times; ye people pour out your heart before him; God is a refuge for us." Psalm 62:8

"When you feel you're all alone, and your heart would break in two, remember, someone is praying for you."

(*Id.*, Ex. 8.)

(2) Directly on the postal counter adjacent to this display sits a pile of "prayer cards" and a box into which postal service customers can put their prayer requests. The message on the front of the prayer cards reads:

> Twenty-four hours a day, someone is on their [sic] knees praying for the needs of others. If you have a need or prayer request, you can fill out this prayer card or call our Church Office at anytime. If you receive an answering machine, leave a message. Your call will be received and someone will be praying on your behalf.

(*Id.*, Ex. 9.) The reverse side of the prayer cards reads: "Let us Join with You in Prayer. We have a 24–hour Prayer Tower at the Full Gospel Interdenominational Church, Inc., continually praying on the behalf of others." (*Id.*)

(3) There is another display in the SYI CPU containing a framed advertisement for World–Wide Lighthouse Missions, the missionary organization incorporated by the Church to which the SYI CPU's profits are donated. This display, which sits directly opposite a shelving unit containing official USPS postal supplies and forms and above a table used by customers filling out USPS paperwork, offers biblical quotations and explains that the organization is "Endeavoring to Reach the World with the Love of Jesus Christ, one life at a time." (*Id.*, Ex. 2 ¶ 9(c)(vii).)

(4) Directly to the right of the World–Wide Lighthouse Missions display is yet another display that provides additional information about World–Wide Lighthouse Missions, including pamphlets describing various "hands of ministry" trips and envelopes and "appeal flyers" soliciting donations. To the right of this display, immediately to the left of the Postal Service postal boxes, is a donation box, decorated with World–Wide Lighthouse Missions mission photographs.

(5) A "World–Wide Lighthouse Missions" coin donation jar, decorated with mission photographs, sits on the postal counter.

(6) To the left of the postal counter, a television monitor displays Church-related religious videos directly ahead, and in plain view, of customers waiting in line at the postal counter. These television displays have included: videotaped talks by Reverend Kalinsky on various Christian topics; videos explaining the mission of World–Wide Lighthouse Missions, Inc.; a video highlighting the activities of the Church's Sunday School program; a video of performances from several of the Church's choirs; a video entitled "God's Thoughts Toward Us," which promotes the Church's Vacation Bible School; and other videos of television broadcasts that include audible soundtracks with scripture messages and gospel songs.

(7) Above the official Postal Service rental post boxes and on the wall across from the transaction counter are various $8\frac{1}{2}'' \times 14''$ photographs of a number of the Church's events. Among these photographs is a picture of "Wally," a character who delivers Bibles, and conveys religious messages through puppets acting out skits, to children in the community. Wally is depicted standing beside George Washington and Abraham Lincoln.

(8) In addition to the above-listed displays, the SYI CPU features additional seasonal displays, including a large extended crèche, which is displayed in the SYI CPU's storefront window during the Christmas holiday season. In addition, there are, at various times, video presenta-

tions displayed on a television set inside the SYI CPU.

For its part, the Postal Service states that it does not encourage or induce SYI to display the religious materials in the SYI CPU. On the SYI CPU transaction counter, there is a sign, provided by the Postal Service, which reads: "The United States Postal Service does not endorse the religious viewpoint expressed in the materials posted at this Contract Postal Unit." (Dkt. # 52–2, Ex. 8 ¶ 12(a)(1) & attached pictures.) To the right of this disclaimer is another sign, which reads: "[The SYI] United States Contract Postal Unit is operated by the Full Gospel Inter-denominational Church. Thank you for your patronage." (Id., Ex. 8 ¶ 12(a)(2).) The Intervenor Defendants maintain that SYI does not permit its employees to proselytize at the SYI CPU, and that, if a SYI CPU customer requests a prayer, SYI employees are instructed to refer such customers to the Church itself.

## D. THE PLAINTIFF'S CONTACT WITH THE SYI CPU

Cooper, a Manchester, Connecticut resident, maintains that he lived "considerably closer" to the SYI CPU than to the Manchester Post Office. The Defendants deny this assertion, claiming that Cooper lived approximately three miles from both the SYI CPU and the Manchester Post Office. Cooper visited the SYI CPU on a number of occasions, and states that the religious displays there made him "very uncomfortable." On one occasion, Cooper complained about these religious displays to the employees in the SYI CPU. In response to his concerns, Cooper was told that if he did not like the religious displays, he could go somewhere else. Cooper claims that he subsequently did go to the Manchester Post Office to satisfy his postal needs, but the travel involved in doing so is more difficult for him than the travel to the SYI CPU. The Defendants deny that Cooper endured a greater difficulty by traveling to the Manchester Post Office rather than to the SYI CPU. Cooper asserts the circumstances surrounding the SYI CPU violate the Establishment Clause of the First Amendment to the United States Constitution.

## II. DISCUSSION

There are two motions for summary judgment pending before the court, the Defendants' and Cooper's. The parties do not contend that there are issues of fact that need to be resolved. Rather, both claim that, based on the facts the court described above, each is, as a matter of law, entitled to summary judgment. In his Complaint, Cooper seeks: (1) a judgment, entered pursuant to 28 U.S.C. § 2201, declaring that the Defendants have violated his First Amendment rights insofar the Defendants' actions have delegated a "governmental power to a pervasively sectarian institution that exercises such power in a manner inextricably entangled with religious symbolism and expression" and distributed "public funds to a pervasively sectarian institution that uses said funds for the advancement of religion"; and (2) a permanent injunction ordering the Defendants, and their agents, representatives, successors, and those acting in concert with them, to: (a) cease and desist from delegating governmental power to SYI, to the extent that SYI exercises that power in manner inextricably entangled with religious symbolism and expression; (b) cease and desist from distributing public funds to SYI, to the extent that SYI uses such funds for the advancement of religion; (c) take all necessary action to ensure that SYI, in the course of providing postal services, ceases acting in a manner that proselytizes or advances religion; (d) provide adequate and ongoing notice to all CPUs that religious messages may not be conveyed, or religion otherwise advanced, in a manner entangled with the exercise of the

CPU's authority pursuant to its contract with the Postal Service; (e) institute adequate and ongoing procedures for the monitoring of CPUs to ensure compliance with any injunction the court may issues; and (f) adopt adequate and ongoing procedures for correcting violations of any injunction the court may issue.[6] The Defendants, for their part, ask that the court reject Cooper's First Amendment claims and grant summary judgment in their favor on all of Cooper's claims.

## A. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" *Am. Int'l Group, Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine " 'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d

Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The Court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

## B. ANALYSIS

The First Amendment to the U.S. Constitution states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. Cooper maintains that the Defendants are violating the First Amendment because the SYI CPU is a state actor whose religious displays and religious affiliation are prohibited under the First Amendment. Cooper bases his claim that the SYI CPU is a state actor under two theories: (1) the Postal Service has delegated "a uniquely public function to the Church"; and (2) the Postal Service is "deeply entwined in the management and control of the SYI CPU." Cooper claims that the religious displays at the SYI CPU would thus constitute speech by a state actor that is prohibited under the First Amendment. Cooper further maintains that, even if the SYI CPU were not a government actor, its actions would still violate the First Amendment as constituting governmental support and promotion of religious communications. The Defendants reject all of Cooper's claims. The court shall analyze Cooper's claims seriatim.

### 1. State Action [7]

■ It is a fundamental principle of constitutional law that the First Amendment

---

6. Cooper also asks that the court grant him his costs and attorney's fees and "[o]rder such other relief as justice may require."

7. The court points out that much of the case law regarding "state action" addresses the relation of the Fourteenth Amendment, which applies to the individual States and not the

applies only to state actors. *See Gorman–Bakos v. Cornell Co-op Extension of Schenectady County,* 252 F.3d 545, 551 (2d Cir.2001). The purpose of this "state action" requirement is not only to "preserv[e] an area of individual freedom by limiting the reach of federal law and avoi[d] the imposition of responsibility on a State for conduct it could not control ...," but also to assure that constitutional standards are invoked when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (internal quotation marks and citations omitted) (alterations in original). The court must first determine whether the conduct alleged here meets the "state action" requirement.

■ "For the conduct of a private entity to be fairly attributable to the state, there must be such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Flagg v. Yonkers Sav. and Loan Ass'n,* 396 F.3d 178, 187 (2d Cir.2005) (internal quotation marks omitted). "What is fairly attributable [as state action] is a matter of normative judgment, and the criteria lack rigid simplicity." *Brentwood Acad.,* 531 U.S. at 295, 121 S.Ct. 924. Indeed, "no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government." *Id.* at 295–96, 121 S.Ct. 924. There are "a host of facts that can bear on the fairness of such an attribution." *Id.* at 296, 121 S.Ct. 924. As the Supreme Court has noted,

[A] challenged activity may be state action when it results from the State's exercise of coercive power, ... when the State provides significant encouragement, either overt or covert, ... when a private actor operates as a willful participant in joint activity with the State or its agents, .... when [the private actor] is controlled by an agency of the State, when [the private actor] has been delegated a public function by the State, when [the private actor] is entwined with governmental policies, or when government is entwined in [the private actor's] management or control.

*Id.* (internal quotation marks and citations omitted); *see Gorman–Bakos,* 252 F.3d at 552.

### a. Delegation of Public Function to Private Actor

■ "State action may be found in situations where an activity that traditionally has been the exclusive, or near exclusive, function of the State has been contracted out to a private entity." *Horvath v. Westport Library Ass'n,* 362 F.3d 147, 151 (2d Cir.2004); *see Jackson v. Metro. Edison Co.,* 419 U.S. 345, 352, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) (finding "state action present in the exercise by a private entity of powers traditionally exclusively reserved to the State"). The Supreme Court has applied this test strictly. "The fact '[t]hat a private entity performs a function which serves the public does not make its acts [governmental] action.' " *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.,* 483 U.S. 522, 544, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987) (quoting *Rendell–Baker v. Kohn,* 457 U.S. 830, 842, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982)). In addition, the acts of private contractors "do not become acts of the government by reason

---

federal government, to private entities. Nevertheless, "The standards utilized to find federal action, necessary to sustain a claim under the Constitution, have been held to be identical to those employed to detect 'state action.' " *Wenzer v. Consol. Rail Corp.,* 464 F.Supp. 643, 647 (D.Pa.1979).

of their significant or even total engagement in performing public contracts." *Rendell–Baker,* 457 U.S. at 841, 102 S.Ct. 2764. Rather, as this district has noted, "to constitute state action under the public function doctrine, private conduct must not only be something the government traditionally does, but it also must be something that *only* the government traditionally does." *Szekeres v. Schaeffer,* 304 F.Supp.2d 296, 311 (D.Conn.2004) (emphasis in original).

■ There is no question that the function performed by the Postal Service is a public one. Indeed, the Postal Services's very *raison d'être, see supra* Part I.A., is to provide services to the public. Thus, insofar as the SYI CPU operates under its contract with the Postal Service, it also provides a public function. As noted above, however, the performance of a function that serves the public is not, by itself, dispositive of the issue here. In addition, the fact that the SYI CPU performs its public services pursuant to a contract with the Postal Service does not render its conduct as state action. Rather, the question is whether the Postal Service has delegated to the SYI CPU a function that is traditionally the exclusive prerogative of the government.

The function of postal services, and hence the function delegated to the SYI CPU, is one that has traditionally been performed by the government. In England, the sovereign has provided postal services since, at least, the early sixteenth century, when King Henry VII "instituted [a] ... permanent letter carriage on specified routes." Christina M. Bates, *From 34 Cents to 37 Cents: The Unconstitutionality of the Postal Monopoly,* 68 Mo. L.Rev. 123, 126 (Winter 2003). "By the early 18th century, the posts were made a sovereign function in almost all nations because they were considered a sovereign necessity." *U.S. Postal Serv. v. Council of Greenburgh*

*Civic Ass'ns,* 453 U.S. 114, 121, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981). The English postal system was eventually brought to the British colonies in North America. At first, the "individual colonial assemblies organized postal systems of their own. . . . [In 1707, however,] the English Post Office ... established a postal system within the American colonies." Bates, *supra,* at 128. In July of 1775, after the American colonists began to resist English management of the postal system, "the Continental Congress, compelled by the need for a dependable channel of communication to the army and to state assemblies upon which it relied for financial support, established its own government-managed postal operation." *Id.* at 129. The Articles of Confederation, enacted after the American Revolution, "granted the Congress the 'power of ... exacting such postage ... as may be requisite to defray the expences [sic] of the said office ... (conferring upon Congress) the sole and exclusive right (of) establishing and regulating post offices.'" *Id.* at 130 (quoting Articles of Confederation, art. IX, in 9 Journals of the Continental Congress 919 (Worthington C. Ford, ed. U.S. Government Printing Office, 1907)). Finally, the U.S. Constitution itself authorizes Congress "[t]o establish Post Offices and post Roads," U.S. Const. art. I, § 8, cl. 7, and the Postal Service has operated throughout nearly the entire history of the United States, *see generally* Bates, *supra.* Therefore, it is clear to the court that the performance of postal services is a traditional function of the government.

The issue here, though, is not only whether the government has traditionally performed postal services, but whether such services have traditionally been the exclusive function of the government. The Supreme Court has found very few activities qualify under the "public function" test. To date, the Supreme Court has found only the operation of a company

town, *see Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), the management of a municipal park, *see Evans v. Newton,* 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966), the running of an election, *see Nixon v. Condon,* 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932); *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953), and the furnishing of medical treatment to injured prison inmates, *see West v. Atkins,* 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988), to constitute public functions that are traditionally the exclusive prerogative of the government. In addition, the Supreme Court has declined to find an exclusive state function in a wide variety of circumstances. *See, e.g., Blum v. Yaretsky,* 457 U.S. 991, 1011–12, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (nursing home care); *Rendell–Baker,* 457 U.S. at 842, 102 S.Ct. 2764 (education of children); *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 161–64, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) (enforcement of statutory lien by a private warehouse); *Jackson,* 419 U.S. 345, 352–53, 95 S.Ct. 449, 42 L.Ed.2d 477 (furnishing of utility services). The court must therefore examine whether the services at issue here would qualify under the Supreme Court's "public function" test.

"Since its establishment, the United States Postal Service has exercised a monopoly over the carriage of letters in and from the United States. The postal monopoly is codified in the [Private Express Statutes], 18 U.S.C. §§ 1693–1699 and 39 U.S.C. §§ 601–606." *Air Courier Conference of Am. v. Am. Postal Workers Union AFL–CIO,* 498 U.S. 517, 519, 111 S.Ct. 913, 112 L.Ed.2d 1125 (1991); *see U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.,* 540 U.S. 736, 741, 124 S.Ct. 1321, 158 L.Ed.2d 19 (2004) ("[T]he Postal Service retains [a] monopoly over the carriage of letters."). In fact, aside from a few exceptions, Congress, through the Private Express Statutes, has made it a crime for private entities to

> establish[ ] any private express for the conveyance of letters or packets,[8] or in any manner causes or provides for the conveyance of the same by regular trips or at stated periods over any post route which is or may be established by law, or from any city, town, or place to any other city, town, or place, between which the mail is regularly carried. . . .

18 U.S.C. § 1696(a). Indeed, as the Code of Federal Regulations states,

> It is generally unlawful under the Private Express Statutes for any person other than the Postal Service in any manner to send or carry a letter on a post route or in any manner to cause or assist such activity. Violation may result in injunction, fine or imprisonment or both and payment of postage lost as a result of the illegal activity.

39 C.F.R. § 310.2(a).

Nevertheless, although the sending and carrying of letters via postal routes have

---

**8.** The Eighth Circuit has pointed out that "[t]he expression 'letters' or 'packets' occurs in the postal laws of our county from the beginning and was intended to include communications in writing conveyed from one person to another." *Williams v. Wells Fargo & Co. Express,* 177 F. 352, 357 (8th Cir.1910). "Thus a correspondence limited to a single sheet was formerly called a single letter; two sheets a double letter; and three sheets a triple letter. All such communications composed of four or more sheets were called a packet." *Id.* Historically, the term "packet"

has not been construed to mean "parcels or packages of merchandise," and the government "has neither attempted to reserve to [the Postal Service] a monopoly of the transportation of merchandise in parcels or packages weighing less than four pounds, nor ... prohibited private express companies or others making regular trips over established post roads or between cities where mails are regularly carried, from engaging in the business of carrying such parcels of merchandise for hire" *Id.* at 358.

traditionally been monopolized by the state and not performed by private entities, *cf. Kann Corp. v. Monroe*, 425 F.Supp. 169, 171 (D.D.C.1977), Congress, in certain circumstances, has allowed private entities to perform such postal services. As the Supreme Court has noted, "In 1979, the Postal Service suspended the [Private Express Statutes] restrictions for 'extremely urgent letters,' thereby allowing overnight delivery of letters by private courier services." *Air Courier Conference of Am.*, 498 U.S. at 519, 111 S.Ct. 913 (quoting 39 C.F.R. § 320.6). In addition, "the provisions of 18 U.S.C. § 1696(c)[ ] allow[ ] private conveyance of letters if done on a one-time basis or without compensation, and [the provisions of] 39 U.S.C. § 601(a)[ ] allow[ ] letters to be carried out of the mails if certain procedures are followed...." *Id.* at 525, 111 S.Ct. 913. Furthermore, "A provision of the [Private Express Statutes] allows the Postal Service to 'suspend [the Private Express Statutes restrictions] upon any mail route where the public interest requires the suspension.'" *Id.* at 519, 111 S.Ct. 913 (quoting 39 U.S.C. § 601(b)).

In addition, despite the Postal Service's monopoly over the carriage of letters, not all public services performed by the Postal Service are traditionally the exclusive function of the government. For example, the delivery of packages of merchandise has not traditionally been the exclusive prerogative of the state. As the Eighth Circuit stated in 1910:

> While from [case law] it will be seen many questions arose touching the right of the government to be protected in its monopoly in the business of receiving, transporting, and delivering the mail matter of the country, consisting of letters or packets of letters, and touching the construction of penal laws designed to prohibit all others than the Post Office Department of the government from engaging in the business of carrying letters or packets for hire over post roads,

yet in [no case] has it been decided or even contended the word "packet" ... was designed or intended by Congress to be construed as granting the Post Office Department a monopoly of the right to receive, transport, and deliver parcels or packages of merchandise. On the contrary, the entire history of the legislation on this subject from the beginning, and the many adjudicated cases as well, show the legislative intent to have been to maintain for the government a monopoly only of the carriage of its mails, consisting of letters and packets of letters, and the like mailable matter. While it is true parcels or packages of merchandise ... may be received and carried through the mails, yet that the government has neither attempted to reserve to its Post Office Department a monopoly of the transportation of merchandise in ... packages weighing less than four pounds, nor has prohibited private express companies or others making regular trips over established post roads or between cities where mails are regularly carried, from engaging in the business of carrying such parcels of merchandise for hire, is evident from the language employed in the opinion of the Supreme Court in *Express Cases*, 117 U.S. 1, 6 S.Ct. 542, 29 L.Ed. 791 [1886].... And that it has not reserved such right of monopoly in the carriage of merchandise such as was carried in this case by defendant, and perhaps lacks the constitutional power to so do, is clearly stated in the opinion delivered by Mr. Justice Field in *Ex parte Jackson*, 96 U.S. 727, 6 Otto 727, 24 L.Ed. 877 [1877], wherein it is said:

"But we do not think that Congress possesses the power to prevent the transportation in other ways, as merchandise, of matter which it excludes from the mails. To give efficiency to its regulations and prevent rival postal sys-

tems, it may perhaps prohibit the carriage by others for hire, over postal routes, of articles which legitimately constitute mail matter, in the sense in which those terms were used when the Constitution was adopted, consisting of letters, and of newspapers and pamphlets, when not sent as merchandise; but further than this its power of prohibition cannot extend." *Williams,* 177 F. at 358–59. Indeed, when discussing "state action" as it relates to a private parcel delivery service, one district court has stated that, although "[o]ne normally associates parcel delivery with government action," there "is not a sufficient similarity [between the Postal Service and private parcel delivery services] upon which to base a finding of state action similarity," and that "[t]he public function analogies are insufficient for the added reason that parcel delivery service has never been a state monopoly in this country." *Howe v. United Parcel Serv., Inc.,* 379 F.Supp. 667, 673–74 (S.D.Iowa 1974).

Based upon the relevant case law and the facts of this case, the court cannot conclude that the Postal Service has contracted out to the SYI CPU an activity that traditionally has been the exclusive function of the government. First, the monopoly the Postal Service has over the carriage of letters is not dispositive here. The monopoly created by Congress makes it unlawful for "any person other than the Postal Service in any manner to send or carry a letter on a post route or in any manner to cause or assist such activity." 39 C.F.R. § 310.2(a). Even if the court were to find that the sending and carrying of letters on postal routes is traditionally the exclusive function of the government,[9] such a finding would not settle the issue before the court. As noted above, *see supra* Part I.A., contract postal units, such

as the SYI CPU, accept mail from the public, sell postage and supplies, and provide selected special services, including postal money orders and registered mail. There is no indication that CPUs, including the SYI CPU itself, actually carry or send letters over postal routes in a fashion similar to private express courier services such as Federal Express or the United Parcel Service. That is to say, the Postal Service has not contracted out to a private entity an activity that traditionally has been the exclusive function of the state because the SYI CPU does not perform, either for itself or for other private entities, the specific activity (i.e., the delivery and carrying of letters over postal routes) over which the Postal Service maintains its monopoly. Consequently, even if the carriage of letters is traditionally the exclusive function of the state, the SYI CPU, because it does not perform this function, cannot be considered a state actor on that account.

Second, with regard to the above-mentioned functions actually performed by the SYI CPU, such functions are not encapsulated within the Postal Service's congressionally-created monopoly, and therefore, on that account, the court cannot say that they are traditionally the exclusive prerogative of the government. The "public function" test does not, however, have to be met through a congressionally-created monopoly. Nevertheless, the court finds that the various services performed by the SYI CPU are not exclusive to the government for the simple reason that such services are performed by various private entities throughout the country. One does not traditionally need to go to a post office to buy postal supplies or money orders. Such services are not "exclusive" to the government. In addition, as indicated

---

**9.** Given the fact that there are exceptions to the Postal Service's monopoly, the court is not certain that the "exclusivity" element of the "public function" test is met.

above, the delivery of packages of merchandise (i.e., non-letter packages) has not traditionally been the exclusive function of the government. In fact, even the selling of government stamps is not "exclusive" to the government. One can buy stamps at a number of private institutions (such as, for example, grocery stores), and not have to travel to a post office to purchase postage. Indeed, the fact that the Postal Service has thousands of CPUs operating across the country performing the above-mentioned postal services is itself an indication that those services are not exclusively performed by the government. Therefore, the court finds that there is no state action here under the "public function" test. Consequently, Cooper's motion for summary judgment is denied insofar as his motion is based upon the "public function" test for state action.

### b. Entwinement

■ "In certain circumstances, a private organization may be so entwined with government that its conduct may be deemed *per se* state action." *Lown v. Salvation Army, Inc.,* 393 F.Supp.2d 223, 244 (S.D.N.Y.2005) (citing *Brentwood Acad.,* 531 U.S. 288, 121 S.Ct. 924, 148 L.Ed.2d 807; *Lebron v. Nat'l R.R. Passenger Corp.,* 513 U.S. 374, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995)). "That is, the State need not have coerced or even encouraged the events at issue in the plaintiff's complaint if 'the relevant facts show pervasive entwinement to the point of largely overlapping identity' between the State and the entity that the plaintiff contends is a state actor." *Horvath,* 362 F.3d at 154 (quoting *Brentwood Acad.,* 531 U.S. at 303, 121 S.Ct. 924). For example, in *Brentwood Academy,* the Supreme Court held that a high school athletic association was a state actor because it was overwhelmingly controlled by public officials acting in their official capacities, and because its staff was eligible for certain public employee benefits. *See Brentwood Acad.,* 531 U.S. at

299–300, 121 S.Ct. 924. The Supreme Court found the entwinement in *Brentwood Academy* to be so pervasive that the athletic association's actions constituted state actions. *Id.* at 291, 121 S.Ct. 924.

Given the facts of this case, the court finds that the SYI CPU is so entwined with the Postal Service that the SYI CPU's actions may be considered the actions of the Postal Service. The Defendants argue that there is no evidence from which a reasonable finder of fact could conclude that the Postal Service has entwined itself with the SYI CPU. To support its argument, the Defendants point out that the signs on the outside of the SYI CPU indicate to the public that the SYI CPU is not an "official" post office, but rather a contract postal unit that is operated by a private entity on private property. In addition, the Defendants maintain that the Postal Service has no proprietary interest in the SYI CPU other than the postal products and equipment, and that there is no evidence that it has some direct financial stake in the SYI CPU's success in running the contract postal unit. The Defendants further maintain that the Postal Service's relationship with the SYI CPU is purely commercial, and that the employees of the SYI CPU, which controls all internal management decisions, are not Postal Service employees, that it has minimal direct involvement with the daily operations of the SYI CPU, and that there are no government employees on the Board of Directors of SYI or the Church. According to the Defendants, these facts demonstrate that the SYI CPU is a private, not state, actor, and that any religious displays in the SYI CPU are wholly attributable to SYI, not the Postal Service. The Defendants claim that the fact that the SYI CPU provides postal services to the public, and generates revenue from such services, does not justify a finding of government action.

The court is not persuaded by the Defendants' arguments here. The Defendants claim that the signs outside the SYI CPU indicate to the public that the SYI CPU is not an "official" post office, but a contract postal unit that is operated by a private entity on private property. Based on the various exhibits submitted by the parties, the court can discern at least two signs on the outside of the SYI CPU (one on the front door and one hanging on the outside wall) that state "Sincerely Yours, Inc. United States Contract Postal Unit." The court does not agree, however, that SYI CPU customers will automatically interpret the phrase "United States Contract Postal Unit" to mean that this particular site is a private entity providing postal services on private property, not an "official" post office. There is no definition of "contract postal unit" contained in the signs outside of the SYI CPU, and the court is highly doubtful that the public at large understands the implications of the term "contract postal unit" (i.e., that a CPU is operated by a private contractor, not the Postal Service). Indeed, the words "United States" in "United States Contract Postal Unit" may lead the public to believe that the SYI CPU is an "official" post office run by the government. Moreover, there is a relatively substantial sign on the outside of the SYI CPU that contains the words "United States Post Office" and displays the Postal Service's aquiline emblem. (See dkt. # 49–B, Exs. 3 & 4; dkt. # 40, Ex. 8.) Such a sign most likely indicates to the SYI CPU's customers that the SYI CPU is an "official"

branch of the Postal Service. Therefore, the Defendants have not demonstrated that the signage on the outside of the SYI CPU informs the public that the SYI CPU is, in fact, a private entity operating on private property.

As for the Defendants' arguments that it has no proprietary interest in the SYI CPU other than the postal products and equipment, and that there is no evidence that it has some direct financial stake in the SYI CPU's success in running the contract postal unit, the court finds such arguments to be without merit. The contention that Postal Service has no proprietary interest "other than the postal products and equipment needed to operate the CPU" is of doubtful merit, considering one of the SYI CPU's main functions is to provide postal products and services by using postal equipment. In addition, the Postal Service, pursuant to its contract with SYI, was required to pay for the build-out of the SYI CPU counter and the construction of post office boxes within the SYI CPU. The Defendants' assertion that there is no evidence that it has a direct financial stake in the SYI CPU's success is inconsistent with the facts here. The Postal Service, although providing a public service, functions to generate revenue for the federal government.[10] In some circumstances, the Postal Service has decided that, instead of opening new classified units in particular locations, its interests (financial and otherwise) would be best served by contracting out certain postal services to private entities in those loca-

---

10. In fact, the generation of revenue is the reason why Congress granted the Postal Service a monopoly over the sending and carrying of letters over postal routes. Congress did not grant the Postal Service this monopoly because the Postal Service is inherently better than private couriers at providing such services. Rather, "[t]he monopoly was created by Congress as a revenue protection measure for the Postal Service to enable it to fulfill its

mission." *Air Courier Conference of Am.*, 498 U.S. at 519, 111 S.Ct. 913. That is, the monopoly "prevents private competitors from offering service on low-cost routes at prices below those of the Postal Service, while leaving the Service with high-cost routes and insufficient means to fulfill its mandate of providing uniform rates and service to patrons in all areas, including those that are remote or less populated." *Id.*

tions. The Defendants admit that the Postal Service's relationship with SYI is commercial, as, pursuant to the Postal Service's contract with SYI, it receives a percentage of the revenue generated at the SYI CPU. It is true, as the Defendants point out, that the governmental receipt of revenue generated by a private entity is not, in and of itself, enough to establish state action by that private entity. *Cf. Rendell–Baker*, 457 U.S. at 847, 102 S.Ct. 2764. Nevertheless, the Postal Service's receipt of revenue from the SYI CPU's conduct is a relevant fact that can be used, along with other facts, to show pervasive entwinement.

The Defendants further argue that, as the employees of the SYI CPU are not Postal Service employees, and because the Postal Service has minimal direct involvement with the daily operations of the SYI CPU, the Postal Service has not entwined itself with SYI. The parties agree that the SYI CPU's employees are not employees of the Postal Service.[11] Still, the fact that SYI CPU employees are not Postal Service employees is not dispositive. Cases in which courts must decide the "state actor" question involve, by their very nature, conduct by private entities or individuals. *See, e.g., West v. Atkins*, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (holding a private physician under contract with North Carolina to provide orthopedic services at a state-prison hospital on a part-time basis was a state actor). Indeed, the issue before the court centers around the question of whether conduct that was not performed by the government through government employees should nevertheless be attributed to the government. If the workers at the SYI CPU were, in fact, Postal Service employees, the court's task would be simpler because the court could

more readily find government action in a situation where Postal Service employees were performing postal services pursuant to a contract with the Postal Service; this, however, is not the situation here. Again, the issue here is whether the conduct of a private entity, acting through its employees, can be attributed to the government. Consequently, the Defendants' assertion that the SYI CPU employees are not Postal Service employees carries little weight.

With regard to the Defendants' argument that the Postal Service has minimal direct involvement with the daily operations of the SYI CPU, the court finds that the Postal Service's involvement is not so minimal as to preclude a finding of entwinement with the SYI CPU. The Defendants claim that the Postal Service's involvement with the SYI CPU is no different from other situations in which the government has entered into contracts with private corporations but no state action was found. The court disagrees with the Defendants' claim. The Defendants are correct when they state that a private actor does not automatically become a state actor simply because of a contractual relationship with the government. In addition, the court agrees that the government, including the Postal Service, is free to contract with private parties. Yet, the court can differentiate the circumstances of this case from those of other cases in which the government has contracted with private entities. If, for example, the government wishes to have engines built for its airplanes, it may enter into a contract with an appropriate manufacturer (such as Pratt & Whitney) to have such services performed. A manufacturer such as Pratt & Whitney is a private entity that is in the business of

---

**11.** The court notes, however, that the Postal Service has provided in-house training to SYI CPU employees.

building airplane engines; it provides these services for those entities, private and public, with whom it contracts. It is not the sole function of Pratt & Whitney to perform services pursuant to governmental contract. Here, on the other hand, the SYI CPU's only function is to perform its contract with the Postal Service. Indeed, the Church created SYI expressly for the purpose of operating the CPU, which, pursuant to the contract with the Postal Service, provides postal services. If there were no contract, the SYI CPU would not exist.

Furthermore, the court finds that the Postal Service's oversight of the SYI CPU is such that the SYI CPU may be considered pervasively entwined with the government. The Postal Service, through its "Postal Operations Manual," sets forth instructions on how CPUs must operate; these instructions range from matters of appearance to matters of daily operation. (*See* dkt. # 49–B, Ex. 20, USPS 000012) ("The appearance of your unit reflects not only on you ... but also on the Postal Service.... It is very important to the success of your unit that your customers can recognize you as an official United States Post Office contract unit. The Postal Service has dedicated exterior and interior signage that will help you establish this identity."); (*Id.* at USPS 000021–000022) (instructing CPUs as to their "Daily Tasks.") Additionally, the contract between the Postal Service and SYI CPU gives the Postal Service broad oversight of the SYI CPU. That contract states: "The Postal Service[ ] reserves the right, without prior notice, to conduct audits and customer surveys and to review and inspect the supplier's performance and the quality of service at any time during the operating hours of the Contract Postal Unit. A written report will be submitted to the supplier for corrective action, if necessary." (*Id.*, Ex. 6, Section E.) Such oversight goes beyond the standard arms-

length relationship into which contracting parties enter. Consequently, the court finds that the SYI CPU is so entwined with the Postal Service that its conduct may be deemed state action.

2. The Establishment Clause

A finding of state action does not end the court's analysis. Rather, the court must further determine whether the displays in the SYI CPU do, in fact, violate the Establishment Clause of the First Amendment. In the court's view, Cooper is challenging the constitutionality of both the religious displays at the SYI CPU, and the contractual relationship between the Postal Service and SYI, a corporation set up by the Church.

"In addressing Establishment Clause challenges, the Supreme Court has observed that '[t]he First Amendment contains no textual definition of 'establishment,' and that the term itself is 'not self-defining.' " *Skoros v. City of New York,* 437 F.3d 1, 16 (2d Cir.2006) (quoting *McCreary County, Ky. v. ACLU of Ky.,* 545 U.S. 844, 874–75, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005)). "Most obviously, the Clause prohibits the establishment of a national or state church, but the Court has never construed its mandate to apply only to this most obvious proscription." *Id.* (citing *Lemon v. Kurtzman,* 403 U.S. 602, 612, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)). "It has long been accepted that the Establishment Clause prohibits government from officially preferring one religious denomination over another: 'The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.' " *Id.* (quoting *Larson v. Valente,* 456 U.S. 228, 244, 102 S.Ct. 1673, 72 L.Ed.2d 33, (1982)). "[N]eutrality is the touchstone of First Amendment analysis[ ] ... [that] provides a sense of direction in evaluating the variety of problems that can arise under the

Establishment Clause...." *Id.* (internal quotation marks and citations omitted).

 In reviewing Establishment Clause claims, the courts "apply the three-prong analysis articulated by the Supreme Court in *Lemon* ...." *Id.* "*Lemon* instructs that, consistent with the general neutrality objective of the Establishment Clause, government action that interacts with religion (1) 'must have a secular ... purpose,' (2) must have a 'principal or primary effect ... that neither advances nor inhibits religion,' and (3) 'must not foster an excessive government entanglement with religion.'" *Id.* (quoting *Lemon,* 403 U.S. at 612–13, 91 S.Ct. 2105). The court points out that the *Lemon* test has been much criticized over the years, and some members of the Supreme Court have called into question its usefulness. *See, e.g., Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,* 508 U.S. 384, 398, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (Scalia, J., concurring in the judgment) (likening the *Lemon* test to "some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried, ... stalk[ing] our Establishment Clause jurisprudence ...."); *see also Skoros,* 437 F.3d at 17 n. 13 (collecting Supreme Court cases containing various criticisms of the *Lemon* test). "Nevertheless, the Supreme Court has never specifically disavowed *Lemon's* analytic framework." *Skoros,* 437 F.3d at 17 n. 13 (collecting cases). Indeed, the Second Circuit "has regularly relied on *Lemon* in evaluating Establishment Clause challenges and ... reiterated that 'the Lemon test continues to govern our analysis of Establishment Clause claims.'" *Id.* (quoting *Peck v. Baldwinsville Cent. Sch. Dist.,* 426 F.3d 617, 634 (2d Cir.2005)). Accordingly, this court must apply the *Lemon* test to Cooper's Establishment Clause challenge.

#### a. The Religious Displays at the SYI CPU

 As the court has found there to be state action in this case, it shall first address Cooper's argument that the religious displays at the SYI CPU violate the Establishment Clause of the First Amendment.

##### i. Secular Purpose

The first prong of the *Lemon* test dictates that "[w]hen government action interacts with religion, ... the government purpose must be secular." *Id.* at 18. "The requirement is not intended to favor the secular over the religious, but to prevent government from 'abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters.'" *Id.* (quoting *Corp. of Presiding Bishop of Church of Jesus Christ of Latter–Day Saints v. Amos,* 483 U.S. 327, 335, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987)). So, for example, in a case where New York City had a policy that allowed certain Jewish and Muslim symbols to be displayed in schools in order "to foster mutual understanding and respect for the many beliefs and customs stemming from [the] community's religious, racial, ethnic and cultural heritage" and to "promote the goal of fostering understanding and respect for the rights of all individuals regarding their beliefs, values and customs," the Second Circuit held that the purpose of these religious displays was "[n]ot only ... clearly secular; ... [but] one in which there is a strong public interest." *Id.* at 18–19.

The court finds that the religious displays in the SYI CPU, *see supra* Part I.C, do not have a secular purpose. Those displays, which are evangelical in nature, were set up by the Church, whose mission is to "engage in the preaching of the Gospel of Jesus Christ," "establish ...

Churches for the advancement of the kingdom of Jesus Christ," and "send forth preachers and workers whose princip[al] objective shall be to promote the Kingdom of the Lord Jesus Christ." (*See* dkt. # 49-B, Ex. 2 ¶ 1(b).) Upon a brief review of the SYI CPU's displays, one finds, among other things, the following: "prayer cards," which encourage SYI CPU customers to submit prayer requests and join the Church in prayer; solicitations for donations to the Church's missionary organization; and, television displays of Church-related videos.[12] Unlike the religious displays in *Skoros,* whose purpose was not to endorse a particular religion, but rather promote the concept of "pluralism," it is clear that the purpose of these religious displays is to assist the Church in its above-stated mission to promote a particular religion, i.e., Christianity. There is no indication that the purpose of the SYI CPU's religious displays are meant to impart to the reasonable observer anything other than the Church's evangelical mission, and the court cannot fathom how one could argue otherwise.

### ii. Primary Effect

"The second prong of the *Lemon* test mandates that the 'principal or primary effect' of the challenged government action 'must neither advance nor inhibit religion.'" *Skoros,* 437 F.3d at 29 (quoting *Commack Self–Serv. Kosher Meats, Inc. v. Weiss,* 294 F.3d 415, 430 (2d Cir.2002)). "[T]his analysis is 'highly fact-specific,' asking: 'Would a reasonable observer of the display in its particular context perceive a message of governmental *endorsement* or sponsorship of religion?'" *Id.* (emphasis in original) (quoting *Elewski v. City of Syracuse,* 123 F.3d 51, 53 (2d Cir.1997)). "[T]he concept of endorsement is not limited to government coercion or efforts at proselytization; it is intended to take account of the numerous more subtle ways that government can show favoritism to particular beliefs or convey a message of disapproval to others." *Id.* As the Second Circuit has stated,

> The endorsement test does not require courts to sweep away all government recognition and acknowledgment of the role of religion in the lives of our citizens .... Rather, it seeks to ensure that government does not make a person's religious beliefs relevant to his or her standing in the political community, ... thereby sending a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community....

*Id.* (internal quotation marks and citations omitted).

It is clear that the primary effect of the religious displays in the SYI CPU is to advance religion (in this particular case, Christianity). There is no serious contention made by the parties that a reasonable observer would perceive the SYI CPU's above-described religious displays as anything other than endorsements or sponsorships of the Church and its evangelical mission. Indeed, these displays put the Church's beliefs front and center, out for the public to see, endorsing the Church's form of Christianity and seeking outsiders to join the Church in its mission. Therefore, the court concludes that SYI CPU's religious displays violate the second prong of the *Lemon* test.

### iii. Entanglement

"The final prong of the *Lemon* test considers whether the challenged government

---

**12.** This is not an exhaustive list, but merely a sampling, of the religious displays at the SYI CPU.

action 'foster[s] excessive state entanglement with religion.'" *Id.* at 35 (quoting *Commack Self–Serv. Kosher Meats, Inc.,* 294 F.3d at 425). "Entanglement is a question of kind and degree." *Lynch v. Donnelly,* 465 U.S. 668, 684, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). "[T]he First Amendment does not prohibit all interaction between church and state. The entanglement of the two becomes constitutionally 'excessive' only when it has 'the effect of advancing or inhibiting religion.'" *Skoros,* 437 F.3d at 36 (quoting *Agostini v. Felton,* 521 U.S. 203, 233, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997)). "Thus, entanglement analysis is properly treated as an aspect of *Lemon's* second-prong inquiry into ... [the] effect [if the government action]." *Id.* (internal quotation marks omitted). "The factors relevant to determining excessive entanglement are similar to the factors used to determine effect; a court considers the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority." *Id.* (internal quotation marks omitted).

The court finds that the religious displays in the SYI CPU violate the third prong of the *Lemon* test. Unlike in *Skoros,* where the defendants attempted to categorize the holiday symbols displayed in the schools as "secular," the Defendants here make no such assertion. Rather, they admit that the religious displays are meant to support the mission of the Church, whose non-secular character is manifest. There is nothing wrong, *per se,* with the Church exhibiting religious displays. Here, however, the Church is exhibiting such displays while it is performing its duties under a contract with the Postal Service, i.e., the U.S. Government. To an outsider, the fact that the SYI CPU's religious displays are in relatively close proximity to Postal Service displays (e.g., the Postal Service eagle) could indicate that, despite certain signs indicating otherwise, the Postal Service endorses the purpose and message of those religious displays. The court therefore finds that the religious displays in the SYI CPU violate the third prong of the *Lemon* test. Because the court has found there to be state action here, and because the court has further found that all the *Lemon* factors have been violated, the court holds that the SYI CPU's religious displays violate the Establishment Clause of the First Amendment.

### b. The Contractual Relationship Between the Postal Service and SYI

Cooper does not only claim that the religious displays at the SYI CPU violate the First Amendment, he also appears to be asserting that the relationship between the Postal Service and the SYI is inherently unconstitutional. That is, Cooper wishes the court to declare that the contractual relationship between the Postal Service and SYI, which was created by the Church to operate the SYI CPU, inextricably entangles the government with a sectarian institution, thereby providing funds to a sectarian institution, which thereafter uses such funds for religious purposes. Cooper thus asks the court for an order permanently enjoining the Postal Service from contracting out postal services to the Church and other religious institutions. The court declines to grant Cooper's request in this respect.

■ "It long has been established ... that the State may send a cleric, indeed even a clerical order, to perform a wholly secular task." *Roemer v. Bd. of Pub. Works of Md.,* 426 U.S. 736, 746, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976). Indeed, the Supreme Court "has never held that religious institutions are disabled by the First Amendment from participating in publicly sponsored social welfare programs." *Bow-*

*en v. Kendrick,* 487 U.S. 589, 609, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988). For example, the Supreme Court has "upheld an agreement between the Commissioners of the District of Columbia and a religiously affiliated hospital whereby the Federal Government would pay for the construction of a new building on the grounds of the hospital." *Id.* (citing *Bradfield v. Roberts,* 175 U.S. 291, 20 S.Ct. 121, 44 L.Ed. 168 (1899)). As the Supreme Court noted,

> In effect, the Court [in *Bradfield*] refused to hold that the mere fact that the hospital was 'conducted under the auspices of the Roman Catholic Church' was sufficient to alter the purely secular legal character of the corporation, [*Bradfield,* 175 U.S.] at 298, 20 S.Ct. 121, particularly in the absence of any allegation that the hospital discriminated on the basis of religion or operated in any way inconsistent with its secular charter.

*Id.* In addition, "[t]he notion that the Constitution would compel a religious organization contracting with the state to secularize its ranks is untenable in light of the Supreme Court's recognition that the government may contract with religious organizations for the provision of social services." *Lown,* 393 F.Supp.2d at 249 (citing *Bowen,* 487 U.S. 589 at 609, 108 S.Ct. 2562, 101 L.Ed.2d 520).

Based upon the language of the cases cited above, the court cannot declare that, as a matter of law, the contract between the Postal Service and the SYI CPU violates the First Amendment. The contract between the Postal Service and the SYI is purely secular in nature. Under the contract, SYI is to operate the SYI CPU, which provides postal services. There is no indication in either the record or the parties' submissions that the contract calls for anything resembling "sectarian" or "religious" purposes. Therefore, although the

SYI CPU is under the "auspices" of the Full Gospel Interdenominational Church, this is not sufficient to alter the SYI CPU's secular character.

Furthermore, the court points out that the contractual relationship between the Postal Service and SYI does not violate the three-pronged *Lemon* test.[13] The first prong, that the government's interaction with a religious organization must have "secular purpose," is, as the court noted above, satisfied. The Postal Service's interaction with SYI was to enter into a contract to perform a postal function, which is a secular, public service. The relationship between the Postal Service and SYI is not religious in nature, i.e., the Postal Service has not contracted for services that are in any way sectarian or religious.

The second prong, that the government's interaction with a religious organization must have a primary effect that does not advance religion, is also satisfied. The primary effect of the Postal Service's interaction with SYI is that the SYI CPU performs the secular, public postal services that otherwise would have been performed by the Postal Service (or another CPU). There is no indication that the Postal Service is "advancing" or "sponsoring" the Church's religion simply by entering into a contractual relationship with SYI; the Postal Service solicited bids for that contract from an entire community, not just from religious organizations. The fact that a religious organization happened to win that bid does not mean that the Postal Service was advancing or sponsoring religion.

The third prong, that the government's interaction with a religious organization must not foster an excessive entanglement with religion, is also satisfied. It is true,

---

**13.** The court has already detailed the *Lemon* test above, and need not do so again here.

as the court discussed above, that the Postal Service oversees the operation of the SYI CPU. The SYI CPU's primary purpose, however, is to provide postal services. Thus, the Postal Service's oversight of the SYI CPU is related to that secular purpose, not to any religious purpose. In short, the Postal Service provides postal supplies to the SYI CPU and ensures that the SYI CPU is operating within the Postal Service's standards. From what the court can determine, the Postal Service has no direct interaction with the Church's religious activities. Therefore, although the religious displays in the SYI CPU violate the First Amendment, Cooper cannot demonstrate that the contractual relationship between SYI and the Postal Service, in and of itself, violates the First Amendment.

■ The court also rejects Cooper's argument that the Postal Service is "distributing public funds" to SYI in violation of the First Amendment. It is true that "the Establishment Clause does prohibit government-financed or government-sponsored indoctrination into the beliefs of a particular religious faith, and [the Supreme Court] ha[s] accordingly struck down programs that entail an unacceptable risk that government funding would be used to advance the religious mission of the religious institution receiving aid." *Bowen*, 487 U.S. at 612, 108 S.Ct. 2562. Cooper seems to imply, by using the word "distributing," that the Postal Service is simply giving away public money to a religious organization. The facts here, though, do not support the contention that the government is directly funding, or aiding, religion. The Postal Service has entered into a performance-based contract with SYI. This is not a case where the government is doling out money for nothing; rather, SYI receives whatever funds it is entitled to for services performed under the contract by the SYI CPU. That is, SYI earns its money. After SYI has

earned its money, it is free, as any other person or organization would be, to use that money in whatever (lawful) way it sees fit.

In addition, the court points out that "[t]here is no effect of advancing religion by the government contracting with a sectarian organization unless there is some special benefit granted to the organization by virtue of the contract." *Comm. for Pub. Educ. and Religious Liberty v. Sec'y, U.S. Dep't of Educ.*, 942 F.Supp. 842, 867 (E.D.N.Y.1996) (finding that "the mere payment of money to a religious institution as part of a commercial lease does not create an improper effect under the First Amendment"). The court does not see what "special benefit" the Postal Service has granted to SYI by virtue of their contract. The Postal Service has granted the "benefit" of that contract (i.e., permission for an organization to perform postal services for which the organization and Postal Service receive compensation) to thousands of organizations across the country. The court fails to see how that benefit is "special" to SYI.

Finally, the court notes the potential consequences of finding that the contractual relationship between the Postal Service and SYI is unconstitutional because SYI has a religious affiliation would be, in the court's opinion, overly severe. The Postal Service has demonstrated that it has CPUs all over the country. Some of those CPUs are run by religiously-affiliated organizations; for example, religiously-affiliated colleges and universities, in order to better serve their students, might enter into contracts with the Postal Service to operate CPUs on their campuses. In the court's estimation, a finding that such an arrangement is unconstitutional because the government is compensating, for services rendered, a religiously-affiliated college operating a CPU, is not supported by

the case law and is not a holding that the Second Circuit or Supreme Court would endorse. Consequently, the court rejects Cooper's arguments insofar as they attack the contractual relationship between the Postal Service and SYI.

## III. CONCLUSION

For the foregoing reasons, the Defendants' motion (dkt.# 38) is **GRANTED in part and DENIED in part,** and the Plaintiff's motion (dkt.# 41) is **GRANTED in part and DENIED in part.** The court has determined that: (1) for the purposes of the Establishment Clause of the First Amendment, the SYI CPU is a state actor; (2) the religious displays in the SYI CPU violate the Establishment Clause of the First Amendment; and (3) the contractual relationship between the Postal Service and SYI does not violate the Establishment Clause of the First Amendment. Therefore, the court hereby **ORDERS** the following:

(A) The Plaintiff's motion for summary judgment (dkt.# 41) is **GRANTED** in part with regard to the Plaintiff's request for a declaratory judgment. A *declaratory judgment* shall issue forthwith stating the following:

> To the extent that Sincerely Yours, Inc., and all other individuals or entities, in the course of operating contract postal units or otherwise providing postal services pursuant to their contracts with the United States Postal Service, act in a manner that proselytizes or advances religion, including, but not limited to, the posting of religious displays that proselytize or advance religion, such conduct violates the First Amendment to the United States Constitution.

(B) The Plaintiff's motion for summary judgment (dkt.# 41) is **GRANTED** in part with regard to the Plaintiff's request for an injunction. An *injunction* shall issue whereby:

(1) Sincerely Yours, Inc., in the course of operating the Sincerely Yours, Inc. Contract Postal Unit or otherwise providing postal services pursuant to its contract with the United States Postal Service, shall cease from acting in a manner that proselytizes or advances religion, and shall remove any and all religious displays that proselytize or advance religion in the Sincerely Yours, Inc. Contract Postal Unit;

(2) the United States Postal Service shall provide adequate and ongoing notice to all contract postal units that, in the course of providing postal services, they shall not act in a manner that proselytizes or advances religion; and

(3) the Postal Service shall institute adequate and ongoing procedures for the monitoring of contract postal units to ensure compliance with the court's injunction prohibiting contract postal units, in the course of providing postal services, from acting in a manner that proselytizes or advances religion.

(C) The Plaintiff's motion for summary judgment (dkt.# 41) is **DENIED** with regard to all other forms of relief the Plaintiff seeks.

(D) The Defendants' motion for summary judgment (dkt.# 38), which the Intervenor Defendants have joined and adopted (*see* dkt. #s 59 & 60), is **GRANTED** with respect to all forms of relief that are not included in the declaratory judgment and injunction, and **DENIED** with respect to the relief that the declaratory judgment and injunction allow.

The Clerk of the Court shall close this file.

**SO ORDERED.**